# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 01-2493, 01-3071, 01-3978, 01-4027, 01-4139,
01-4235, 02-1130, 02-1136, & 02-2153

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

KEITH MCGEE, THOMAS KING,
LARONE BRIM, HAROLD MCKINZIE,
TONY BANKS, RABBONI SMITH,
JOHN ECTOR, and FLOZELL MCGEE,

*Defendants-Appellants*.

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 99 CR 952—**Ruben Castillo**, *Judge.*

———————

ARGUED OCTOBER 1, 2004—DECIDED JUNE 3, 2005

———————

Before FLAUM, *Chief Judge*, and BAUER and POSNER,
*Circuit Judges*.

BAUER, *Circuit Judge*. A grand jury indicted the eight
above-named defendants and seven others in 1999 in a
thirty-nine count indictment based on their respective roles
in a drug conspiracy in the Englewood neighborhood on
Chicago's South Side. The indictment charged the defendants

with various drug offenses, including conspiracy to distribute narcotics, possession with intent to distribute narcotics, and use of a telephone to facilitate the conspiracy. Larone Brim pleaded guilty and the other seven defendants-appellants proceeded to trial. After a three-week trial, a jury convicted Keith McGee, Thomas King, Tony Banks, Rabboni Smith, John Ector, and Flozell McGee on all counts. The jury acquitted Harold McKinzie on the conspiracy count, but convicted him on two telephone facilitation counts. McKinzie subsequently pleaded guilty to two previously severed counts of possession with intent to distribute.

The defendants, individually and collectively, appeal raising numerous issues. For the reasons stated herein, we affirm the defendants' convictions, vacate and remand Ector's case for resentencing, and order a limited remand with respect to the sentences of King, Smith, Keith McGee, Flozell McGee, Brim, and McKinzie pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

### A. Investigation and Indictments

In 1997, while investigating Charles Jackson, a suspected drug dealer in Chicago, the FBI identified Robert Allen as a cocaine supplier in Chicago's Englewood neighborhood. The FBI eventually obtained authorization to monitor Allen's land line and cellular telephones from April to June 1998. During that period, the FBI intercepted over 4,000 telephone calls, many of which involved drug transactions.

In August 1998, based in part on information from the intercepted phone calls, the FBI arrested Allen, Antwayne Palmore, Samuel Redding, and Irving Tillman—all of whom subsequently pleaded guilty to drug conspiracy charges and agreed to cooperate with the government. Thereafter, and in part as a result of their cooperation, the grand jury

returned an indictment against defendants Keith McGee, King, Banks, Smith, Ector, Flozell McGee, McKinzie, Brim, and seven others. All defendants were charged with conspiring, between January 1997 and August 1998, to distribute and possess with intent to distribute more than five kilograms of cocaine and more than fifty grams of cocaine base, in violation of 21 U.S.C. § 846. The grand jury further charged King with possessing with intent to distribute approximately 123.5 grams of cocaine on or about January 6, 1998, in violation of 21 U.S.C. § 841(a)(1). In addition, the grand jury charged McKinzie with possessing with intent to distribute approximately 60.7 grams of cocaine and 92 grams of cocaine base on or about December 8, 1999, in violation of 21 U.S.C. § 841(a)(1). The grand jury also charged each defendant with at least one count of using a telephone to facilitate the conspiracy, in violation of 21 U.S.C. § 843(b).

On September 1, 2000, Brim pleaded guilty to the conspiracy count and to four telephone facilitation counts. On September 8, 2000, the district court severed the possession with intent to distribute counts against McKinzie from the trial. The remainder of the case proceeded to trial in January 2001.

## B. Evidence at Trial

Allen, Palmore, Samuel Redding, and Tillman all testified for the government at trial. According to Allen and Palmore, Allen, Palmore, Franklin Redding, and King "grouped together" to sell cocaine in early 1997 due to a "drought" of cocaine in Chicago. Each had been involved in the drug trade previously. Allen was in charge of the operation; Palmore contributed money, suppliers, and customers; Franklin Redding contributed customers and drugs; and King picked up kilograms of cocaine from suppliers and sold them to drug dealers. Although Palmore and Franklin Redding left

the operation at different points due to disputes over money, both later resumed buying and selling drugs in connection with the operation.

The drug operation obtained powder cocaine in kilogram quantities from various drug suppliers. Before the drugs were resold, Allen usually "rerocked" the powder cocaine, adding a mix to it in order to increase the volume of the cocaine and the operation's profits. In order to create crack cocaine, Allen heated a mixture of the "rerocked" cocaine, baking soda, and water to an oil base and then cooled it into a hardened substance. The operation then resold the "rerocked" powder cocaine and crack cocaine to drug dealers in quantities ranging from 63 grams to multiple kilograms. From early 1997 to August 1998, the operation sold over 100 kilograms of crack cocaine and over 100 kilograms of powder cocaine, with a profit of approximately $31,000 on each kilogram. Allen and Palmore kept most of the profits; Franklin Redding and King received $1,000 and $500 per kilogram respectively.

Like many drug dealers, Allen and his cohorts frequently spoke in code. Allen translated the code for the government before trial and explained the code to the jury at trial. Crack cocaine was referred to as "tight" or "hard." With respect to quantity, "125th street" was code for 125 grams of drugs, "halfway home" was code for one-half kilogram, and "all the way home" was code for one kilogram. Although the operation generally expected payment from customers upon delivery of the drugs, it "fronted" drugs to certain customers with the understanding that they would pay the operation within a reasonable period of time.

In presenting the evidence, the government addressed each defendant individually, beginning with Banks. Allen testified that he and Banks grew up together. When Banks was released from jail in 1998, Allen gave him money, drugs, and a car. Allen testified that there were numerous

sales between him and Banks, and that Banks bought a total of approximately two kilograms of cocaine from Allen in 1998. Allen fronted Banks drugs if they were "just for him," and Banks paid Allen on delivery when he acted as a middleman. On occasion, Allen cooked crack cocaine for Banks.

Ector began dealing drugs with Allen in 1998. According to the evidence presented at trial, Ector purchased a total of four kilograms of powder cocaine from the drug operation in 1998. On one occasion, in early 1998, Ector arranged with Palmore to buy one-eighth of a kilogram of cocaine; Allen and Samuel Redding met Ector at a gas station to complete the deal. Samuel Redding also testified about two additional drug deals between the operation and Ector, with Ector purchasing 250 grams of cocaine on one occasion and one-half kilogram of cocaine on another occasion.

King actively worked for the drug operation between 1997 and April 1998. While working for the operation, King picked up kilograms of cocaine from suppliers and sold it to drug dealers. On two occasions in 1997, King delivered one-eighth of a kilogram of cocaine to Samuel Redding. In late 1997, King delivered one-half of a kilogram of cocaine to Irving Tillman. On two occasions in 1998, King sold Irving Tillman one-eighth of a kilogram of cocaine. On both occasions in 1998, King delivered the drugs to Irving Tillman's apartment and was present while he cooked the powder cocaine into crack cocaine.

The McGee brothers, Keith and Flozell, engaged in numerous drug deals with Allen and his associates. Between 1997 and 1998, Keith McGee purchased four kilograms of powder cocaine and two kilograms of crack cocaine from the operation. Keith McGee acted as a middleman, selling those drugs to other customers, including his brother, Flozell. During 1998, members of the drug operation sold a total of three kilograms of powder cocaine to Flozell McGee in one-

eighth of a kilogram quantities. The FBI intercepted and recorded numerous phone calls reflecting the McGee brothers' involvement in the operation.

Allen met McKinzie in late 1997 when McKinzie began buying drugs from the operation. According to Allen, McKinzie bought powder and crack cocaine in quantities of one-sixteenth to one-eighth of a kilogram. Irving Tillman testified that he delivered drugs to McKinzie approximately twenty times between late 1997 and early 1998.

Allen met Rabboni Smith in 1997. In 1997 and 1998, Smith purchased approximately five kilograms of powder cocaine and four kilograms of crack cocaine. The operation fronted drugs to Smith, who paid various members of the operation after he sold the drugs to his customers. Samuel Redding sold drugs to Smith on twenty occasions at Allen's home. Palmore sold drugs to Smith about twelve times in spring of 1998. In early 1998, Irving Tillman saw Smith buy drugs from Allen ten times. The FBI intercepted and recorded numerous phone calls reflecting Smith's involvement in the drug operation.

Smith took the stand in his own defense at trial. Smith admitted that it was his voice on the tape-recorded phone calls, and he admitted that he sold at least one-quarter of a kilogram of powder and crack cocaine between February and July 1998. Smith also admitted that the operation fronted drugs to him. According to Smith, he was coerced into engaging in the charged conduct under threat of serious bodily harm or death to himself, his wife, and his daughter in order to pay a debt to the Black Disciples street gang. Smith testified that he joined the Black Disciples in March 1992 and attempted to leave the gang in 1993, but the gang terrorized and fined him for trying to leave. Smith eventually left the gang after paying a portion of his fine and enrolled in an engineering program at the Illinois Institute of Technology ("IIT"). Smith testified that he was crossing the IIT campus with a classmate in February 1998 when he was accosted by Palmore, Samuel Redding, and

another Black Disciple. According to Smith, the men had come to collect on Smith's unpaid debt, and they forced him into their car at gunpoint. Smith was taken to Allen's apartment and beaten with a Wiffle Ball bat. According to Smith, he was ultimately forced to work off the old debt as well as an additional fine by selling drugs for Allen, whom Smith insisted had never left the Black Disciples.

The jury convicted all defendants on all counts with the exception of McKinzie, who was acquitted on the conspiracy count and convicted on two telephone facilitation counts. The defendants appeal numerous issues.

## II.  Discussion

### A.  Joint Brief

Defendants argue that the district court thwarted their right to cross-examine the government's witnesses and, in the end, denied them a fair trial. Defendants first criticize the district court for denying their request for the "versions of offenses" portion of the presentence reports of six government witnesses. Next, defendants assail the district court for putting limitations on their cross-examination of Allen, primarily with regard to two letters Allen wrote to the prosecutor in which he offered to cooperate with the government in exchange for leniency. Finally, defendants contend that the district court barred ordinary impeachment by prior inconsistent statement and the use of FBI reports to attempt to refresh a witness' recollection. We will address each argument in turn.

### 1.  Jencks Act

We begin with defendants' contention that the district court improperly denied them access to the "versions of offenses" portions of government witnesses' presentence

reports, which defendants view as Jencks Act material. The Jencks Act provides, in relevant part:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b). The Jencks Act defines a statement as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). Defendants point out that, pursuant to the local rules, a defendant must submit his own version of the offense for the presentence report, or approve or adopt the government's version. Thus, according to defendants, the versions of offenses are statements under Jencks, and the government must produce them upon request after direct examination, to the extent that they relate to the testimony of the witness.

We are not persuaded by defendants' argument. First, we have long recognized "the critical importance of maintaining the confidentiality of presentence reports." *United States v. Cyphers*, 553 F.2d 1064, 1069 (7th Cir. 1977). As we noted in *United States v. Corbitt*, 879 F.2d 224, 229-30 (7th Cir. 1989), it is essential for district courts to receive full disclosure of information relevant to sentencing, especially considering the role presentence reports play in guidelines sentencing, and the defendant may not be as forthcoming with information if he knows that his spurned confederates will have access to the report. Defendants point out that this "free flow of information" rationale may be less compelling when the witness publicly testifies about information in the report, but sources other than the defendant contribute to the report, and those sources may be less willing to take the risks associated with exposure than the defendant

who agrees to testify for the government at trial. Moreover, presentence reports may contain information relevant to ongoing criminal investigations, and the government has a strong interest in preventing disclosures that could tip off unindicted coconspirators or otherwise compromise such investigations. *Corbitt*, 879 F.2d at 235. The concern about compromising investigations is particularly significant with a cooperating witness like Allen, who pleaded guilty to offenses based on his central role in a sprawling drug conspiracy, provided the government with a trove of information that led to the indictments of dozens of young men, and testified against his former associates in at least two trials. *United States v. Trennell*, 290 F.3d 881 (7th Cir. 2002).

In addition, presentence reports are not statements of the defendant within the meaning of Jencks. They are reports prepared by probation officers used primarily as an aid to district courts at sentencing, and what defendants would characterize as adoption (within the meaning of Jencks) of the government's version of the offense is usually little more than failing to submit their own version of the offense or failing to object to the probation officer's version. Finally, as noted by the Second Circuit, it is difficult to argue that Congress intended for the Jencks Act to mandate routine disclosure of presentence reports to third parties when defendants did not even have access to their own presentence reports until 20 years after the enactment of the Act:

> The Jencks Act was enacted in 1957. At that time, disclosure of presentence reports was even more restricted than it is now. Indeed, it was not until 1975 that defendants were entitled to see their own presentence reports as a matter of right. It would be ironic to hold that Congress, almost two decades earlier, intended the Jencks Act to require the routine release of such reports to third parties.

*United States v. Moore*, 949 F.2d 68, 71 (2d Cir. 1991) (citation omitted). Accordingly, we join the other circuits that have considered this issue, *United States v. Jackson*, 978 F.2d 903, 909 (5th Cir. 1993); *United States v. Moore*, 949 F.2d 68, 71 (2d Cir. 1991); *United States v. Dansker*, 537 F.2d 40, 60 (3d Cir. 1976), and conclude that the Jencks Act does not require routine disclosure of presentence reports to third parties.

This conclusion does not deprive defendants of access to cooperating witnesses' presentence reports in every case. If a defendant suspects that a presentence report contains *Brady* material, he may request that the district court conduct an in camera review of the report to determine if his suspicions are warranted. *United States v. Anderson*, 724 F.2d 596, 598 (7th Cir. 1984). That procedure was requested by the defendants in this case and performed by the district court. The district court subsequently released information on Allen's financial condition contained in the report and refused to disclose the remainder of Allen's report or the other cooperating defendants' reports because they did not contain impeachment or exculpatory material. The district court thus fulfilled its duty and afforded defendants their rights. Accordingly, we reject defendants' arguments that their trial rights were compromised by the district court's failure to order disclosure of the entirety of the "versions of offenses" portions of the presentence reports.

## 2. Cross-examination of Allen

Defendants' next argument centers on the limits placed on their cross-examination of Allen. According to defendants, the district court viewed the cross-examination of Allen "as an exercise in futility and a waste of time" and "imposed blunt-edged, arbitrary limits on defense cross-examination by forcing defendants to accept the cross-examination of [Allen] by one defense lawyer." Def.'s Joint Brief at 17. Speci-

fically, defendants assail the district court for limiting their cross-examination of Allen with regard to two handwritten letters he sent to the prosecutor prior to his sentencing and prior to his testimony in the instant case. In the letters, Allen assures the prosecutor that he is "not a bad person," that he is "riding with the government 100%," and that he knows enough information so that "we can make arrangements for [Allen] to go home." He also reminds the prosecutor that he has children that need him and that his mother is sick, and adds that the prosecutor "seems like a very nice, understanding woman." The district judge initially permitted Ector's attorney to question Allen about the letters, but sustained a subsequent government objection to questions about the letters because he already had granted Ector's counsel "a lot of leeway" and "the subject [was] completely exhausted." Tr. 1306, 1317-18. Attorneys for Banks, Smith, Keith McGee, Flozell McGee, McKinzie, and King were not permitted to cross-examine Allen about the letters. According to defendants, that ruling by the district court denied them their Sixth Amendment right to confront and cross-examine Allen about his biases and motivations for testifying. In response, the government asserts that the letters were inadmissible hearsay evidence and that even if the letters were not hearsay, any error by the district court was harmless.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The clause protects the criminal defendant's "right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). The right to cross-examination is not unlimited; trial courts have wide latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'

safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

We agree with the defendants that the better practice would have been for the district court to grant each defendant's attorney some leeway to cross-examine Allen on the letters to the prosecutor. Moreover, the government's characterization of the letters as hearsay is inaccurate; the letters are textbook examples of impeachment evidence. However, even if the court's ruling amounted to a violation of the defendants' Confrontation Clause rights, the ruling is subject to harmless error review. *Van Arsdall*, 475 U.S. at 684. The *Van Arsdall* Court advised courts to consider the following factors when determining whether a Confrontation Clause violation is harmless: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination other-wise permitted, and of course, the overall strength of the prosecution's case." *Id.*

After an exhaustive review of the record, we are confident that even if the district court erred in not allowing each defendant's attorney to cross-examine Allen about the let-ters, the error was harmless beyond a reasonable doubt. Al-though Allen was an important witness for the prosecution and that militates in favor of defendants, other relevant factors demonstrate that the challenged ruling was harm-less. First, the jury was aware of the gist of the letters due to Ector's attorney's cross-examination of Allen. The district court allowed Ector's attorney to ask Allen the following questions about the letters:

Q. Well, in this letter, you're saying that you want to do more to help yourself, don't you?

A. Exactly.

Q. And you're saying that you just want a little time off for cooperating; you say that, don't you?

A. Yes, I say that.

Q. And you say you want to do it to go home, right?

A. Yes.

Q. And not do any time, right?

A. Yes.

Q. And you say, "I know you can help me. I'm not asking for anything free. I can earn mine. I just want you to be fair, [that is] why I'm making my effort to earn all the credit I need to go home." You say that, right?

A. Yes, I do.

Tr. 1257-58. After some argument over government objections, Ector's attorney continued to cross-examine Allen about the letters:

Q. And by writing this letter, you're trying to convince [the prosecutor] to help you get a low sentence so you can go home, aren't you? Isn't that your purpose?

A. Yes.

Q. And you're telling—you tell her in this letter, or it's your feeling at this point that you'll do anything that you can do for the government or for her so that you can go home, isn't that true?

A. No, I wouldn't do anything, but I tell the truth as far as cooperating.

Q. Well, you talk about setting people up, don't you?

A. Yes.

Q. You're willing to do that?

A. Yes, that's cooperating. That's not doing anything.

Q. And you're telling her that you'll try to get other people to work for the government, right, friends and relatives?

A. I was explaining to her that I can get someone to do something on my behalf to help me get a reduced sentence.

Q. And that you'll work as a [confidential informant] if she lets you out and does that, right?

A. Yes.

Q. You're really telling her you'd do almost anything to get out of jail, right?

A. I'm not telling her I do anything [sic], I'm just letting her know that I cooperate.

Q. You tell her that you don't have a limit on what you'd do. You tell her that, don't you?

A. Yes.

Tr. 1260-61. Thus, even though not every attorney was permitted to cross-examine on the letters, the jury heard about the content of the letters, and Allen admitted that he wrote the letters and acknowledged his motivations for writing them, which casts doubt on defendants' assumption that further questioning on the letters would have had a devastating effect on Allen's credibility. *Cf. Van Arsdall*, 475 U.S. at 677 (trial court did not allow *any* cross-examination of government witness regarding government's dismissal of an unrelated charge in exchange for the witness' cooperation).

Second, Allen was extensively cross-examined on bias and motive by each defense attorney. Ector's attorney was the first defense attorney to cross-examine Allen, and he hammered Allen's credibility for approximately three hours. Among other things, he questioned Allen about the follow-

ing topics: his practice of diluting cocaine to fool customers and increase profits; his 1993 arrest on narcotics charges; his immediate return to dealing drugs in violation of his bond conditions; his cooperation with the government after the 1993 arrest that ultimately resulted in a sentence of 40 months instead of 10 to 15 years; his return to drug dealing about two months after his release from prison in violation of his supervised release; his monthly bribes to a probation officer to avoid the consequences of his dirty urine drops; his bribes to his former employer so that the employer would issue him paychecks and tell his probation officer that he was still working there; his bribes to employees at City Hall in exchange for the transfer of property rights to him; his involvement with the Black Disciples; his "trap cars" with secret compartments for hiding cocaine; his 1998 arrest on narcotics charges; his immediate cooperation with authorities and his willingness to turn on friends, relatives, and other associates; his deal with the government in which the government would recommend a 20-year sentence in exchange for his cooperation; and the Rule 35 motion filed by the government that could further reduce his sentence depending on his testimony at trial. King's attorney cross-examined Allen about his purchase of two grenade launchers and grenades; the mix that Allen added to dilute cocaine and cheat his customers; his deal with government; and the possibility that he met with the other cooperating defendants in the Metropolitan Correctional Center ("MCC") to coordinate their testimony. Keith McGee's attorney asked Allen about the details of his plea agreement and his drug dealing. Counsel for Banks cross-examined Allen on how he laundered his drug money; the property he forfeited as part of his plea agreement; the false monthly reports he submitted under oath to his probation officer; the government's failure to prosecute him for perjury; his defrauding of a local Boys and Girls Club; and the lies that Allen told the government immediately after his arrest. In addition to impeaching Allen on many of the areas already covered by other defense

lawyers, Smith's attorney cross-examined Allen about his fights in prison and about the fact that he had met with prosecutor so many times that he was on a first name basis with her.[1] Flozell McGee's attorney peppered Allen with questions about the massive profits he made as a drug dealer; his failure to pay taxes; and the disappearance of all the drug money. As the foregoing summary of Allen's cross-examination demonstrates, the extent of cross-examination otherwise permitted was considerable and provided defendants with ample opportunity to paint a reasonably complete picture of Allen from which the jury could assess his credibility.

Finally, defendants' arguments about the limits placed on cross-examination run headlong into the overall strength of the government's case. The government supported its case with what may be the most powerful and reliable evidence in a drug conspiracy prosecution: tape recordings of numerous phone calls between the defendants that evidenced their extensive involvement in the illegal drug trade. Palmore, Redding, and Tillman all provided testimony at trial that largely corroborated the material aspects of the wiretap evidence and Allen's testimony. Smith took the stand in his own defense and admitted that it was his voice on the tape recordings. As a result, we think that the not-fully-impeached evidence had little or no effect on the reliability of the factfinding process at trial.

In sum, due to Ector's cross-examination of Allen on the letters, Allen's admissions about the contents of the letters, the otherwise extensive cross-examination of Allen by all

---

[1] In his individual brief, Smith also challenges the limitations that the district judge imposed on his cross-examination of Palmore and Redding. After reviewing the record, we conclude that the limitations placed on Smith's cross-examination of Palmore and Redding were reasonable and did not violate Smith's rights under the Sixth Amendment.

defense attorneys, and the overall strength of the prosecution's case, we doubt that further cross-examination on the letters would have had an appreciable effect on the jury's assessment of Allen's credibility or the outcome of the case and conclude that any error by the district court was harmless beyond a reasonable doubt.

### 3. Other Objections

Defendants raise a number of other objections to the district court's rulings, mainly about their attempts to refresh the recollection of government witnesses and impeach government witnesses with prior inconsistent statements. After a careful review of the objections, we conclude that the issues do not warrant extended discussion because the challenged rulings, to the extent that they are erroneous, do not individually or collectively amount to reversible error.

### B. Smith's Brief

### 1. Testimony from Gang Expert

Smith first challenges the district court's denial of his request to appoint Dr. John Hagedorn under 18 U.S.C. § 3006A(e), which authorizes trial courts to appoint experts for indigent defendants if the services are "necessary for adequate representation." Smith argues that Dr. Hagedorn's testimony, which would have explained gang life and drug trafficking to the jury, was necessary because it would have independently corroborated his coercion defense and undermined the government's theory that Smith was dealing drugs for the money. The district court refused to appoint Dr. Hagedorn in a pre-trial ruling, opining that his testimony was neither helpful nor admissible. When Smith renewed his request to appoint Dr. Hagedorn at trial, the district court reaffirmed its ruling, reasoning that "Dr. Hagedorn's testimony is just not necessary under the 700 series of the

rules of evidence, was not necessary for this jury's consideration [and] there's been plenty of testimony about what gangs do and what they don't do in Chicago on the South Side." We review the district court's decision for abuse of discretion. *United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995).

Dr. Hagedorn, a criminal justice professor at the University of Illinois-Chicago who has focused his scholarship on inner-city youth gangs, would have testified that the Black Disciples operate within a highly structured hierarchy where failure to follow gang rules often results in swift and violent penalties, including death. Leaving the gang can be a hazardous undertaking, involving beatings and fines. A gang member that cooperates with law enforcement puts himself and his family at risk of death or serious injury. Furthermore, gangs are driven by profits from drugs sales, and debts are taken seriously and seldom forgiven.

Smith sought to introduce the above-recited testimony to bolster his own testimony that he was kidnaped, beaten, and threatened by the Black Disciples in early 1998 over a debt he incurred by leaving the gang in 1993, effectively coercing him to return to dealing drugs. Smith asserts that Dr. Hagedorn's testimony also would have explained why Smith did not go to the police after the Black Disciples kidnaped and threatened him. In addition, Smith maintains that gang life and drug trafficking are beyond the ken of the average juror. In response, the government argues that Dr. Hagedorn's testimony was unnecessary under 18 U.S.C. § 3006A(e) because the jury already had heard similar testimony from a number of witnesses. We agree with the government.

First, we doubt that the substance of Dr. Hagedorn's testimony was beyond the ken of the average juror. Most jurors are aware that gang members deal drugs, commit violent

acts, and react unfavorably when their misdeeds are reported to authorities. Second, Dr. Hagedorn's description of gang life in Chicago would have been a needless rehashing of ground covered by prior witnesses. For example, FBI Agent Yun, the first witness called by the government, testified that Black Disciple gang leaders may punish a member's violation of a gang rule by ordering that member to be beaten, or even murdered. Allen acknowledged his past membership and role in the Black Disciples, testified about the violent nature of drug trafficking, and stated that there were consequences if people owed him money. Samuel Redding admitted that he was affiliated with the Black Disciples and that the gang pressured him to participate in illegal activity. Palmore acknowledged participation in the beatings of other Black Disciple members on multiple occasions and said that a Black Disciple gang member could not go to the police because it could cost him his life. Smith himself testified extensively about the modus operandi of the Black Disciples. In light of the testimony of Agent Yun, Allen, Redding, Palmore, and Smith about the violent and coercive nature of the Black Disciples, Dr. Hagedorn's testimony was cumulative and unnecessary. The district court did not abuse its discretion by denying Smith's requests to appoint Dr. Hagedorn.

### 2. New and Previously Undisclosed Evidence

Smith next argues that the district court erred in denying his motion for a new trial based on newly discovered evidence. This evidence consists of: (1) a statement by Larone Brim that Allen asked Brim to "touch up" Smith for failure to pay a debt; (2) a statement from Black Disciple Will Carthan that Allen and his associates conducted surveillance of Smith to ensure that he sold narcotics; (3) grand jury testimony from a Black Disciple member in a related investigation that a Chicago police officer received protec-

tion money from the gang; and (4) a statement by Charles Jackson that he heard from Antwayne Palmore, who had heard from a third-party, that Smith had been beaten with a baseball bat for failing to pay a debt.

Under Rule 33 of the Federal Rules of Criminal Procedure, a district court "may vacate any judgement and grant a new trial if the interest of justice so requires." To carry his burden of showing that the interest of justice requires a new trial, a defendant must establish that the evidence: (1) came to his knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial. *United States v. Ryan*, 213 F.3d 347, 352 (7th Cir. 2000). "[W]e approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury." *United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir. 1993). Accordingly, we will reverse the denial of a motion for a new trial only upon a showing of abuse of discretion. *United States v. Reed*, 986 F.2d 191, 193 (7th Cir. 1993).

Every piece of evidence offered by Smith fails at least one prong of the above-recited test. With respect to Larone Brim's statement that Allen asked him to "touch up" Smith for failure to pay a debt and Will Carthan's statement about the Black Disciples' surveillance of Smith's house, Smith fails to address why this evidence could not have been discovered before trial. The grand jury testimony about Black Disciple members paying protection money to the police would have corroborated a largely unchallenged and unsurprising portion of Smith's testimony—that gang members seek to mitigate the risks associated with their unlawful behavior by bribing unscrupulous police officers. It is not the sort of evidence that warrants a new trial. Finally, we doubt that Jackson's statement that Smith was beaten with a bat would lead to an acquittal in the event of

a retrial. Even though the evidence would corroborate a portion of Smith's testimony, a jury would probably still reject his coercion defense because of his admittedly extensive involvement with Allen's drug group and because of his failure to permanently flee the area or seek the assistance of authorities. The district court did not abuse its discretion in denying Smith's motion for a new trial.

### 3. MCC Phone Call Recording

Smith also challenges the trial court's ruling allowing the government to play the recording of a phone call that Smith made to his employer while he was in federal custody at the MCC. Smith telephoned his supervisor at the Illinois Department of Transportation to explain his sudden absence from work and told him that a relative from out of state had been murdered and that Smith had to retrieve the children and deal with DCFS because they were taking guardianship of the children. Smith also called his wife from the MCC and joked about the elaborate lie he told his boss. Consistent with MCC policy, the phone calls were recorded. The prosecution played the tape of Smith's call to his supervisor at the beginning of his cross-examination after the following colloquy:

BY THE PROSECUTOR:

Q. Mr. Smith, you tell stories. You make things up on occasion. Correct?

A. As I'm sure everyone does. People make things up on occasion. Yes.

Q. Is that a yes, Mr. Smith?

A. Yes.

Q. And you do that, [sic] in many times, to get out of a jam, to get out of a bind. Correct?

A. No.

Q. You don't do it to get out of a jam?

A. No. Now, you said "many times," sir. I'm saying "no" to many times.

Q. Mr. Smith, we'll start here. Have you ever made up stories to get out of a jam?

A. Yes.

DEFENSE COUNSEL:

Judge, I'm going to object for lack of foundation.

THE COURT:

Okay. The objection—the objection is overruled.

BY THE PROSECUTOR:

Q. Have you, in fact, made up stories regarding your situation in this case to get out a jam, Mr. Smith?

A. No.

Q. Have you ever made up a story regarding your situation in this case to get out of a jam, Mr. Smith?

A. No.

Q. Now, Mr. Smith, after you were arrested in December of 1999, you placed several phone calls from the Metropolitan Correctional Center, didn't you?

A. Yes, I did.

Q. And you knew those calls were being recorded, didn't you?

A. No. I did not.

Q. You saw that big sign over the phone that told you that those calls were being recorded, didn't you, Mr. Smith?

> A. The phone was in the middle of a desk, sir, and there was no sign there at all.
>
> Q. Mr. Smith, one of the people you called was your wife. Correct?
>
> A. Yes.
>
> Q. And one of the stories you told was to your employer, isn't that correct, Mr. Smith?
>
> DEFENSE COUNSEL:
>
> Objection. Foundation.
>
> THE COURT:
>
> Overruled.
>
> BY THE WITNESS:
>
> A. I'm not sure what you're talking about.
>
> BY THE PROSECUTOR:
>
> Q. You're not sure what I'm talking about. Well, let me refresh your recollection.
>
> DEFENSE COUNSEL:
>
> Judge, I've never received this. I've never heard it. May we take a break for me to hear it?
>
> THE COURT:
>
> No. You can proceed.

Smith later moved unsuccessfully for a mistrial based on the playing of the tape and then objected unsuccessfully during the government's closing when the prosecutor argued that Smith's coercion defense was just another story "he'd made up to get out of a jam." During rebuttal, the prosecutor likened Smith's defense to a "made-for-TV-movie,"and argued that his coercion story was "strikingly similar to the same lie he told his boss."

Citing Rule 608(b) of the Federal Rules of Evidence, Smith
asserts that the MCC tape was inadmissible extrinsic evi-
dence of a specific instance of conduct bearing on his char-
acter for truthfulness. Smith argues that playing the tape
devastated his credibility, and that the only remedy was a
mistrial because Smith's defense rested on his credibility.
In response, the government maintains that the tape was
admissible extrinsic evidence of a prior inconsistent state-
ment under Fed. R. Evid. 613. The government also notes
that even if the tape was inadmissible extrinsic evidence,
Rule 608(b) does not bar questioning about the conduct, and
Smith eventually admitted that he told this story to his
employer.

We review the district court's evidentiary rulings for abuse
of discretion. *United States v. Hernandez*, 330 F.3d 964, 969
(7th Cir. 2003). If we identify an error that amounts to an
abuse of discretion and a timely objection to the error was
raised at trial, we must determine if the error was harmless
under Fed. R. Crim. P. 52(a). *United States v. Olano*, 507
U.S. 725, 731, 113 S.Ct. 1770, 123 L. Ed. 508 (1993). If no
timely objection was raised at trial, we review the error
under the Fed. R. Crim. P. 52(b)'s plain error standard. *Id.*
In the instant case, the government argues that the playing
of the MCC tape should be reviewed for plain error because
Smith's counsel failed to note the specific ground for her
objection. In the context of this case, we disagree with the
government's position. Smith's counsel objected twice for
lack of foundation and then objected to the prosecutor's
suggestion to "refresh the witness' recollection" with the
tape by saying, "Judge, I've never received this. I've never
heard it. May we take a break for me to hear it?" If the
government actually wanted to use the tape to refresh
Smith's recollection, the proper course would have been to
play the tape for Smith outside the presence of the jury, and
Smith's request to excuse the jury before playing the tape
would have been appropriate. *United States v. Meza-Urtado*,
351 F.3d 301, 303-04 (7th Cir. 2003). But the record shows

that the government used the tape to impugn Smith's credibility rather than refresh his recollection, which makes the prosecutor's "refresh the recollection" comment puzzling. Considering that Smith was in the dark about the contents of the tape and that he was led astray by the prosecutor's "refresh the recollection" foundation, we conclude that Smith's objection was sufficient and that any error is subject to harmless error review.

Rule 608(b) provides, in relevant part:

> **(b) Specific instances of conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . . .

Although Rule 608(b) bars extrinsic evidence of specific instances of conduct bearing on a witness' character for truthfulness, the extrinsic evidence may still be admissible for another reason, such as impeachment for bias, contradiction, or prior inconsistent statement. *United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L. Ed. 2d 450 (1984). The government argues that the tape was admissible because it was extrinsic evidence of a prior inconsistent statement. Under Rule 613(b), extrinsic evidence of a witness' prior inconsistent statement is admissible as long as the witness is given an opportunity to explain the statement and opposing counsel is afforded an opportunity to question the witness about it.

In some instances, it is difficult to distinguish between Rule 608(b) evidence and Rule 613(b) evidence. In this case, however, the government's attempt to characterize the MCC tape as Rule 613(b) evidence is unconvincing and would amount to an end-run around Rule 608(b)'s bar on extrinsic

evidence. The First Circuit's discussion in *United States v. Winchenbach*, 197 F.3d 548 (1st Cir. 1999) helps clarify the distinction between these rules and illustrates why the government's position is without merit:

> In our view, Rule 613(b) applies when two statements, one made at trial and one made previously, are irreconcilably at odds. In such an event, the cross-examiner is permitted to show the discrepancy by extrinsic evidence if necessary—not to demonstrate which of the two is true but, rather, to show that the two do not jibe (thus calling the declarant's credibility into question). In short, comparison and contradiction are the hallmarks of Rule 613(b). . . . In contrast, Rule 608(b) addresses situations in which a witness' prior activity, whether exemplified by conduct or by a statement, in and of itself casts significant doubt upon his veracity. . . . So viewed, Rule 608(b) applies to a statement, as long as the statement in and of itself stands as an independent means of impeachment without any need to compare it to contradictory trial testimony.

*Id.* at 558 (citations omitted). The force of the MCC phone call recording was not due to a comparison of Smith's statements on the tape and his equivocations at trial. Rather, Smith's elaborate lie to his supervisor, in and of itself, cast significant doubt on Smith's character for truthfulness. For this reason, the MCC tape falls squarely within the ambit of Rule 608(b), and it was error for the district court to allow the government to play the tape.

Nevertheless, we decline to reverse Smith's conviction because the error was harmless. *United States v. Jarrett*, 133 F.3d 519, 529 (7th Cir. 1998) (noting that courts do not reverse convictions for evidentiary error unless the error had a substantial or injurious effect on the jury's verdict). Smith, who was charged with and convicted of conspiracy to distribute narcotics and the use of a telephone to facilitate the conspiracy, took the stand in his own defense, admitted that the government properly identified his voice on the phone

call recordings and acknowledged that he dealt cocaine and crack with Allen from February 1998 until July 1998 (Allen was arrested in August 1998), but maintained that he was coerced into dealing drugs in February 1998 to pay off a debt to the Black Disciples. Even if the government had not played the MCC tape and the jury credited Smith's testimony that the Black Disciples pushed him back into drug dealing in February 1998 to pay off a debt, we think that his coercion defense is deficient as a matter of law. The government intercepted and recorded dozens of phone calls between Smith and Allen discussing drug transactions. Based on our review of the record, there is neither a hint of coercion on the tapes nor any discussion of payment of a debt to the Black Disciples (though Allen and Smith often discuss payment for drugs that Allen had fronted Smith). Instead, in the tapes played to the jury and interpreted by Allen, Smith arranges to purchase large quantities of cocaine and crack, Tr. 1035, bickers with Allen about the prices of the drugs, Tr. 1033-35, 1096, complains about the quality of the drugs, Tr. 1084-85, complains that he is losing business and profits because Allen cannot always deliver the cocaine when the customers want it, Tr. 1099-1100, 1106, and informs Allen that he was renting a house to "open up shop there." Tr. 1080. On one occasion, Smith tells Allen that some of his customers claim that they were robbed and that he is holding the customers at gunpoint until they pay him. Tr. 1056-62. Although we do not foreclose the possibility of a viable coercion defense to federal narcotics charges, we are dubious of the defense in circumstances where the defendant engaged in numerous drug transactions over an extended period of time, accepted the proceeds from the drug sales, and made no effort to contact authorities or permanently flee the area. Even if Smith's initial step into the drug conspiracy in 1998 was not voluntary, the only reasonable conclusion supported by the evidence is that Smith persisted in the illegal activity after any immediate danger had passed and failed to permanently flee or seek protection despite having the opportunity to do so, and this

dooms his coercion theory. *United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 62 L. Ed. 2d 575 (1980) ("Under any definition of these defenses [coercion/duress and necessity] one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail."). Consequently, we reject Smith's invitation to reverse his conviction on the basis of a Rule 608(b) error.

### 4. Prosecutorial Misconduct

Smith next argues that he is entitled to a new trial because the prosecutors engaged in a pattern of misconduct that compromised the fairness of his trial. Though he provides us with a long list of instances of prosecutorial misconduct, he only develops arguments with regard to two of them: (1) the government's failure to disclose the MCC tape prior to trial; and (2) an FBI agent's use of sealed recordings of two intercepted phone calls in an interview with Smith's neighbors.[2] Smith moved for a mistrial based on the government's failure to disclose the MCC tape and moved to suppress all of the wiretap evidence based on the FBI agent's use of the two sealed recordings, and the district court denied both motions. We will defer to the district court's judgment on these rulings unless either decision amounted to an abuse of discretion. *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995). When assessing allegations of prosecutorial misconduct, we must first decide whether the government's

---

[2]   Smith's failure to develop arguments with respect to the other alleged instances of misconduct results in waiver of those claims. *United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998). Notwithstanding the waiver problem, many of the actions that Smith challenges, such as the prosecutor's facial expressions when cross-examining Smith, fall far short of prosecutorial misconduct and had no appreciable effect on the outcome of the trial.

conduct was proper. *United States v. White*, 222 F.3d 363, 369-70 (7th Cir. 2000). If we conclude that the conduct was improper, we must consider the conduct in light of the entire record to determine if Smith was so prejudiced by the improprieties that he was deprived of a fair trial. *Id.*

We agree with Smith that the government's failure to disclose the MCC tape was improper. Smith filed a pre-trial motion to require the government to disclose its intention to use any Rule 404(b) or Rule 608(b) evidence at trial, and the district court granted the motion. As explained above, the MCC tape was Rule 608(b) evidence. Consequently, the government should have disclosed its intention to use the tape prior to trial. The FBI agent's use of sealed wiretap evidence was also ill-advised. During an interview with the agent, Smith's neighbors expressed doubt about the charges against Smith because he seemed "too nice." The agent cleared up their doubts by playing two phone call recordings that left no question as to Smith's involvement in the drug trade. The district court had previously issued an order pursuant to Title III that sealed the recordings and permitted the recordings to be disclosed by court order "or to other law enforcement agencies." The government's justification for the disclosure—that the agent played the tapes in order to develop witnesses that could identify Smith's voice on the recordings—strikes us as an unpersuasive, post hoc rationalization for the disclosure.

However, we do not punish prosecutors for government misconduct by reversing convictions. *Boyd*, 55 F.3d at 241. The appropriate focus is on whether the improprieties impacted the outcome of the trial, and we will reverse only if there is a reasonable probability that, in the absence of the improprieties, the defendant would have been acquitted. *Id.* More precisely, we will reverse only if the district court's answer to the question posed above was an abuse of discretion. *Id.* In the instant case, the improprieties identified by Smith do not require a new trial. While the pre-trial disclosure of the tape recordings may have hurt Smith's

reputation with his neighbors, we fail to see how the disclosure had any effect at all on the outcome of Smith's case, considering that the neighbors did not testify at trial or provide the government with incriminating evidence about Smith after the disclosure. Smith does not provide the missing prejudice link in his brief. The failure to disclose the MCC tape, on the other hand, had some potential for prejudice. Had the government disclosed the tape before trial, Smith would have had the opportunity to file a motion *in limine* to exclude the tape and, with the benefit of a briefed motion, the district court may have excluded the tape. As it turned out, the government did not disclose its intention to use the tape, Smith objected at trial based on limited information, and the court allowed the government to play the tape. Nevertheless, the evidence against Smith was overwhelming and his coercion defense was flawed. There is no reasonable probability that pre-trial disclosure of the tape would have led to an acquittal. The district court did not abuse its discretion when it denied Smith's motion to suppress the wiretap evidence or when it denied Smith's motion for a mistrial based on the government's failure to disclose the MCC tape.

## C. McKinzie's Brief

McKinzie was charged with conspiracy to distribute cocaine, two counts of possession with intent to distribute specific amounts of cocaine, and two counts of using a telephone to facilitate the drug conspiracy. After the district court severed the two possession with intent to distribute cocaine counts from the trial, McKinzie went to trial on the conspiracy and facilitation counts. McKinzie advanced a buyer-seller defense at trial, and the jury found him not guilty on the conspiracy count and guilty on the two telephone facilitation counts. Thereafter, McKinzie pleaded guilty to the possession with intent to distribute counts.

McKinzie now challenges the sufficiency of the evidence supporting the telephone facilitation convictions. Because the government must prove the commission of the underlying offense to obtain a conviction on a charge of telephone facilitation, *United States v. Iennaco*, 893 F.2d 394, 396-97 (D.C. Cir. 1990) (Ginsburg, J.), and because he was acquitted on the underlying conspiracy charge, McKinzie argues that we must vacate his conviction on the telephone facilitation counts. McKinzie also maintains that the government offered no evidence that the April 11, 1998, telephone call resulted in a drug transaction and little evidence that the June 7, 1998, conversation led to a drug deal. *United States v. Townsend*, 924 F.2d 1385, 1414 (7th Cir. 1991).

To the extent that McKinzie rests his sufficiency challenge on the fact that the jury acquitted him of the underlying conspiracy charge and convicted him of the compound offense (use of a telephone to facilitate the conspiracy), his position is foreclosed by the Supreme Court's decision in *United States v. Powell*, 469 U.S. 57 (1984). In *Powell*, a case that also involved a conviction on a telephone facilitation count and an acquittal on an underlying conspiracy count, the Court held that an acquittal on one count, even if inconsistent with conviction on another count, does not invalidate the conviction. *Id.* at 64-65. The Court explained that an inconsistent verdict presents a situation where error has occurred, but that "it is unclear whose ox has been gored." *Id.* at 65. In such situations, the defendant should not receive a reversal as a matter of course, especially considering that the acquittal may have been the result of juror mistake, compromise, or lenity. *Id.* The Court also stressed that its holding did not leave criminal defendants like Powell without a remedy:

> [A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be

> confused with the problems caused by inconsistent verdicts . . . . This review should be independent of the jury's determination that evidence on another count was insufficient.

*Id.* at 67. Thus, under *Powell*, we review the sufficiency of the evidence on McKinzie's telephone facilitation conviction independent of the jury's acquittal on the conspiracy count. On a sufficiency challenge, the "evidence and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the government." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001) (citation omitted). "The test is whether, after viewing the evidence, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Jackson*, 300 F.3d 740, 747 (7th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979)) (emphasis in original).

Section 843(b) prohibits the knowing or intentional use of a telephone "in committing or in causing or facilitating the commission of any act or acts constituting a felony [under subchapter I or II of the Comprehensive Drug Abuse Prevention and Control Act]." 21 U.S.C. § 843(b). McKinzie's sufficiency challenge centers on whether his phone conversations with Allen on April 11, 1998, and June 7, 1998, facilitated the commission of the conspiracy, the charged underlying offense. We give the term "facilitate" its ordinary meaning: "to make easier." *United States v. Binkley*, 903 F.2d 1130, 1134-36 (7th Cir. 1990). Viewing the evidence in the light most favorable to the government, we believe that the jury was entitled to conclude that both phone conversations facilitated drug transactions and the drug conspiracy.[3] Dur

---

[3]  We reach this conclusion despite our agreement with McKinzie that the government's evidence against him on the conspiracy count was very weak. A customer like McKinzie can facilitate a
(continued...)

ing the April 11 conversation, McKinzie told Allen, "I need to get, uh, two and a quarter," which Allen understood to mean two and one-quarter ounces of cocaine. Tr. 1003. Although the usual price for that quantity of drugs was $1200, Allen agreed to lower the price to $950 to keep McKinzie as a customer. Tr. 1003-06. Allen told McKinzie, "All right . . . . You gonna be standing on the block. . . . I'm fitting to ride through there." Tr. 1003. McKinzie responded, "[o]kay, I'll be right there." Tr. 1004. Allen understood that he would drive to Normal Avenue to meet McKinzie and consummate the drug deal. *Id.* A rational jury could infer that this phone conversation, during which Allen and McKinzie discussed drug type, quantity, price, and the location of the deal, facilitated a drug transaction. The June 7, 1998, telephone conversation was similar. Allen asked McKinzie, "For the dollar, or you trying to go to 125th?" McKinzie replied, "Yeah, for the dollar," which Allen understood as a request for two and one-quarter ounces of crack cocaine for $1,000. Tr. 1008. McKinzie and Allen set a location for the transaction, and Allen called Tillman to ask him to take care of the deal. Tr. 1927-28. Allen later testified that a drug transaction followed the June 7 conversation with McKinzie. Tr. 1009. Given the recorded phone conversation and Allen's interpretation of it, a rational trier of fact could have found that the June 7 conversation facilitated a drug transaction and the drug conspiracy. Accordingly, we reject McKinzie's suffi-

---

[3] (...continued)
drug conspiracy by purchasing drugs from it. *United States v. Dotson*, 871 F.2d 1318, 1327 n.3 (6th Cir. 1989) (Guy, J., concurring) ("[N]o court has required the government to prove that the defendant charged with the 'facilitating' offense must be the one that committed the substantive offense."); *Iennaco*, 893 F.2d at 396 ("[T]o obtain a conviction on a charge of telephone facilitation, the government must prove actual commission (*by the defendant or another person*) of the alleged underlying offense") (emphasis added).

ciency of the evidence challenge with respect to the telephone facilitation convictions.

## D. Sentencing

The jury's special verdict in this case attributed at least 5 kilograms of cocaine or 50 grams of cocaine base to the conspiracy, which yields a base offense level of 32 under U.S.S.G. § 2D1.1(c)(4) and qualifies defendants for a life sentence pursuant to 21 U.S.C. § 841(b)(1)(A)(ii) and (iii).[4] Brim, who pleaded guilty, admitted to responsibility for powder cocaine but denied responsibility for any crack cocaine. At sentencing, the district court enhanced the defendants' sentences based on factual findings regarding drug quantities and obstruction of justice. Ector, King, Smith, Keith McGee, Flozell McGee, and Brim all were assigned base offense levels of at least 34, and their corresponding sentences were all longer than they would have been based solely on the jury verdict or their admissions. As we now know, the district court's factual findings violated the Sixth Amendment. *United States v. Booker*, 125 S. Ct. 738 (2005). Ector was the only defendant that raised an *Apprendi* objection below, and the government has not explained how the Sixth Amendment error in his sentencing was harmless. Consequently, we will remand Ector's case for resentencing. *United States v. Macedo & Contreras*, 2005 WL 851501, at *6 (7th Cir. Apr. 14, 2005). Due to the forfeited Sixth Amendment errors that increased the sentences of King, Smith, Keith

---

[4] Ector objected to the special verdict form on the basis of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), arguing that the jury must make a defendant-specific rather than an offense-specific determination as to drug quantity. We have rejected similar arguments in the past, *see, e.g.*, *United States v. Smith*, 308 F.3d 726, 740-41 (7th Cir. 2002), and we decline to reconsider those decisions at this time.

McGee, Flozell McGee, and Brim, we will direct a limited *Paladino* remand with respect to their sentences. Banks has not appealed his sentence. McKinzie's sentence was based on the district court's determination that he qualified as a career offender, and we discuss below McKinzie's challenge to that determination.

King, Keith McGee, and Smith also argue that the district court erred by denying them two-level reductions for being minor participants under U.S.S.G. § 3B1.2. This is not a *Booker* issue because a role in the offense adjustment would reduce a defendant's sentence, not enhance it. *United States v. Miller*, 2005 WL 949086, at \*5 (7th Cir. Apr. 20, 2005). To show that a role adjustment is warranted, a defendant must establish that he was substantially less culpable than the average participant. U.S.S.G. § 3B1.2, Application Note 3. We review a district court's decision to deny a defendant a downward adjustment for a minor role in an offense for clear error. *United States v. Rodriguez-Cardenas*, 362 F.3d 958, 959 (7th Cir. 2004).

This was an unusual case in the sense that the principal conspirators cooperated with the government and testified against their underlings, a reverse of the more typical situation where the subordinates turn on the principals. In addition, the principals—Allen, Palmore, Samuel Redding, and Irving Tillman—were prosecuted in a separate indictment. King, Keith McGee, and Smith were undoubtedly less culpable than Allen, Palmore, Redding, and Tillman. King, for example, was described by Allen as a "gofer" who received about $500 per kilogram sold when the operation was clearing a profit of approximately $31,000 per kilogram. Keith McGee was a middleman, buying drugs from the operation, selling drugs to customers, and delivering the customer's money to the operation. Smith engaged in numerous drug transactions with Allen for relatively large quantities of cocaine and crack, and probably has the weakest argument for a minor role adjustment among the three

defendants. Unfortunately for King, Keith McGee, and Smith, the fact that they were less culpable than people like Allen and Palmore does not establish that they are entitled to a minor role adjustment. Defendants must be substantially less culpable than the *average* participants in the conspiracy, not substantially less culpable than the leaders of the conspiracy. This was a wide-ranging drug conspiracy, and King, Keith McGee, and Smith all played roles that could be fairly described as average. Moreover, the role in the offense adjustment is a fact-intensive inquiry that the district court is best suited to address in the first instance, especially after becoming intimately acquainted with the roles of the members of a drug conspiracy during a three-week trial. *United States v. Mojica*, 185 F.3d 780, 790-91 (7th Cir. 1999). Because the record does not convince us that the district court clearly erred when it found that King, Keith McGee, and Smith were not substantially less culpable than the average participants in the conspiracy, we affirm the finding.

In his sentencing brief, King maintains that other defendants with similar roles in the conspiracy fared better with their ultimate sentences than he did, undercutting the guidelines' goal of uniformity in sentencing. This is a credible argument, given that King, Allen's "gofer," was sentenced to 360 months, which is more than ten years longer than the highest sentence of the other defendants that went to trial, and the same sentence that a high-ranking conspirator received in a related prosecution. *United States v. Trennell*, 290 F.3d 881 (7th Cir. 2002) (affirming 360-month sentence of defendant after jury conviction on basis of Allen's testimony; defendant had withdrawn guilty plea after government recommended doubling his sentence compared to other conspirators); 18 U.S.C. § 3553(a)(6) (directing district judge's to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."). Nonetheless,

we think that this argument is best directed to the district court on limited remand, particularly considering that King's sentence was at the bottom of the applicable sentencing range and the district judge may have imposed a different sentence had he known the guidelines were merely advisory.

McKinzie's 210-month sentence was driven by the district court's determination that three prior state court drug convictions qualified him as a career offender under U.S.S.G. § 4B1.1. Without the career offender enhancement, McKinzie would have had an adjusted offense level of 30 and a category III criminal history for a sentencing range of 121-151 months. McKinzie argues that he cannot be considered a career offender because his state court convictions are related to his federal convictions. *United States v. Garecht*, 183 F.3d 671, 675 (7th Cir. 1999). The district court rejected his argument and sentenced him as a career offender. Assuming that the court relied on appropriate sources in making the determination, we see no error in the district court's conclusion that the state court convictions were unrelated to the federal convictions and qualify McKinzie as a career offender. The caveat about the sources is important after the Supreme Court's recent decision in *Shepard v. United States*, 125 S. Ct. 1254 (2005), where the Court held that sentencing courts may not look to police reports or complaint applications to determine whether an earlier guilty plea for burglary amounted to a "generic burglary" that counts as a "violent felony" under the Armed Career Criminal Act. *See* 18 U.S.C. § 924(e) (mandating a minimum 15-year sentence for anyone possessing a firearm after three prior drug offenses or violent felonies). According to the *Shepard* Court, later courts considering such questions are "generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard*, 125 S. Ct.

at 1257. The Court's holding applies with equal force to the guidelines' career offender provision, which increases a defendant's offense level and corresponding sentence if the defendant, among other requirements not at issue here, has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1. *See also United States v. Ngo*, 2005 WL 1023034 (7th Cir. May 3, 2005) (ordering a limited remand where district court considered sources that were not authorized under *Shepard* in finding that defendant was a career offender).

In the instant case, it is unclear what sources the district judge relied on to determine that McKinzie's state convictions and federal convictions were unrelated. At McKinzie's sentencing, the district court listened to the parties' arguments and then stated, "I reluctantly conclude that the government is absolutely correct and that the career offender provision needs to be applied . . . . I think it would be over-inclusive to conclude that these other convictions . . . are part of this relevant conduct." McKinzie Sentencing Tr. at 22. McKinzie attached the state court plea transcripts to his sentencing memorandum, which are sources of "conclusive significance" under *Shepard*, and those transcripts may be enough to establish that McKinzie's state convictions were unrelated to his federal convictions. R. 509; *Shepard*, 125 S.Ct. at 1262. However, we do not know if the district court relied on the state court plea transcripts. Moreover, the government referred to a police report at sentencing, which is a source that may not be considered under *Shepard*. McKinzie Sentencing Tr. at 18. Because of our uncertainty about the sources relied on by the district court, we will order a limited *Paladino*-style remand so that the district judge can inform us if he reached his conclusion about McKinize's career offender status based on sources of "conclusive significance" under *Shepard* and whether he would reimpose his original sentence had he known that the guidelines were not mandatory. *See United States v. White*,

2005 WL 1023032, at *7 (7th Cir. May 3, 2005) ("[T]he mere mandatory application of the Guidelines—the district court's belief that it was required to impose a Guidelines sentence—constitutes error."). If the judge states that he relied on police reports or other sources that are improper under *Shepard* or that he would have imposed a different sentence had he known that the guidelines were advisory, then we will vacate the original sentence and remand for resentencing.

## III.  Conclusion

For the reasons stated herein, we AFFIRM the defendants' convictions, VACATE and REMAND Ector's sentence, and order a LIMITED REMAND with regard to the sentences of King, Smith, Keith McGee, Flozell McGee, Brim, and McKinzie pursuant to the procedure set forth in *Paladino*.

A true Copy:

       Teste:

                     _____
                     *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*