# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-2513

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES W. GARNER, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04 CR 57—**Rudolph T. Randa**, *Chief Judge*.

ARGUED APRIL 3, 2006—DECIDED JULY 26, 2006

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge.* A jury found James W. Garner, Jr., guilty of illegally possessing firearms and ammunition. The district judge ordered him to serve a prison term of 120 months, a term within the range called for by the Sentencing Guidelines. Garner appeals his sentence, contending first that the court improperly adjusted his Guidelines offense level upward for obstruction of justice based on findings that were both improper and inadequate and second that a Guidelines sentence was unreasonable in this case.[1] We affirm.

---

[1] In his briefs, Garner also challenged his conviction on the ground that his trial counsel was ineffective. At argument, the

(continued...)

## I.

On January 13, 2003, Elm Grove, Wisconsin police officer trainee Sandra Brown and her field training officer John Krahn were randomly running records checks of automobile license plates while on patrol as part of Brown's training. In the course of that exercise, they conducted a check on a gray Plymouth minivan they observed in traffic. The check revealed that the vehicle's registration had been suspended based on an emissions violation as well as an unpaid parking citation. The officers stopped the minivan, and their ensuing encounter with Garner, who was driving the vehicle, was captured by the patrol car's audio and video recording equipment. When the officers learned that Garner's driver's license had been suspended, they asked him to step out of the vehicle and arrested him. Krahn searched Garner's person pursuant to the arrest and discovered a clear plastic ziplock baggie containing fourteen nine-millimeter Luger bullets in the pocket of his jacket. By way of explanation, Garner said that he was on his way to a shooting range. When asked if he had a gun in the van, Garner at first said no but then acknowledged that he did. A Star Bonifacio Echeverria semiautomatic nine-millimeter pistol was found in a compartment underneath the front passenger seat of the vehicle. The gun was loaded, with one bullet having been chambered and six additional bullets in the magazine. When asked about the gun, Garner said that

---

(...continued)

court invited Garner's counsel to consider whether Garner wished to pursue the ineffectiveness claim on direct appeal. *See, e.g.*, *United States v. Spence*, No. 05-1848, 2006 WL 1598103, at *1 (7th Cir. June 13, 2006). Garner subsequently withdrew the ineffectiveness claim, reserving it for collateral review. Consistent with Garner's wishes, we acknowledge the withdrawal and make no ruling on the claim of attorney ineffectiveness.

"he had gotten it off some dude in the street in Milwaukee" and that he carried it for protection. R. 86 at 50; Gov. Ex. 2a at 6-7.

Based on these events, Garner subsequently was convicted in Wisconsin state court of carrying a concealed weapon. That offense was a misdemeanor, and Garner received a fine only. No federal charges were filed against Garner at that time.

Roughly one year later, on January 27, 2004, Milwaukee County sheriff's detectives Luke Chang and Joel Streicher stopped the Plymouth van on the south side of Milwaukee after discovering that the van's registration had been suspended for one or more unpaid parking citations. Garner was again driving the van. In the course of the stop, while Streicher was speaking with Garner, Chang shone his flashlight into the van and noticed what looked like a gun lying on the floor, between and to the rear of the front seats. After Garner confirmed that it was indeed a gun, he was ordered out of the vehicle. Chang later retrieved the gun—a .40 caliber Hi-Point semi-automatic pistol—and removed eight rounds of ammunition from the magazine and one round from the chamber. Streicher asked Garner whether there was "anything else" in the van. R. 87 at 204. Garner replied that "there's a sawed-off shotgun in the back." *Id.* Chang found the shotgun—a .12 gauge Birdwing High Standard shotgun, wedged between the third-row seat and the wheel well. Obvious blade and file markings confirmed that the barrel of the gun had been shortened; the stock, wrapped in electrical tape, had been shortened as well. The shotgun was not loaded. Elsewhere in the van officers discovered two boxes of .40 and .45 caliber ammunition, a Hi-Point "Ghost Ring" night sight, and two spent .40 caliber casings. Garner was placed under arrest when the detectives learned that his driver's license had been revoked and that there was an outstanding warrant for his arrest on a probation violation.

Garner was taken to the sheriff's department and advised of his constitutional rights. He told the officers that he had purchased the Hi-Point pistol for $100 from a man at his mother's hair salon. As for the shotgun, he said that he had found it when he was removing effects from his grandfather's home and had left the gun in the van while in the process of moving various belongings. Garner ultimately wrote and signed a statement to this effect. Gov. Ex. 18-A.

Prior to both the 2003 and 2004 vehicle stops, Garner had been convicted of offenses that qualified as misdemeanor crimes of domestic violence under 18 U.S.C. § 921(a)(33)(A). Generally speaking, an offense constitutes a misdemeanor crime of domestic violence if it has as an element the use or attempted use of force and the victim of the offense was the defendant's current or former spouse, someone with whom he lived, or a person with whom he had parented children. *Id.* Federal law prohibits a person convicted of such an offense from possessing a firearm or ammunition in interstate commerce. 18 U.S.C. § 922(g)(9).

Garner was charged in a superseding indictment with three weapons-related charges. First, based on the ammunition found in his possession in the January 13, 2003, vehicle stop, Count One charged Garner with knowing possession of ammunition following a misdemeanor conviction for domestic violence, in violation of section 922(g)(9). Second, based on the sawed-off shotgun found in Garner's van on January 27, 2004, Garner was charged with possessing a firearm not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). Finally, based on his possession of the Hi-Point pistol as well as the shotgun on January 27, 2004, Garner was charged with knowingly possessing a firearm following a misdemeanor conviction for domestic violence, in violation of section 922(g)(9). R. 37.

Garner testified in his own defense at trial. As relevant here, Garner claimed that the Hi-Point pistol found in his

van on January 27, 2004, was not his (he said that the written statement he had given to the sheriff's detectives was not true) but rather belonged to someone by the name of "Tom." R. 88 at 393-94. However, Garner's close friend, Seymour "Itchy" Samuel, testified that Thomas Sankey (the "Tom" to whom Garner referred) had purchased that gun for Garner in early January 2004. Samuel explained that Garner had given him cash for the gun and that Samuel had then arranged for Sankey to purchase the pistol for Garner along with a second firearm for Samuel. Following Garner's arrest on January 27, Samuel contacted Sankey at Garner's request and asked him to falsely represent to investigators that the Hi-Point pistol was his (Sankey's) and that he had simply forgotten the gun in Garner's vehicle after using it at a shooting range. Both Samuel and Sankey testified that Samuel made that request of Sankey. Moreover, electronically-monitored telephone conversations between Garner and Ruth McDowell (his mother) and Garner and Diean Pittman (the mother of several of his children) confirmed that Garner had asked Samuel to solicit such a statement from Sankey. Gov. Exs. 20(b), 20(d), 21(d), 21(e); *see also* R. 90 at 4-6. Sankey was not wild about the idea and did not go along with Garner's plan.

A jury convicted Garner on all three counts of the indictment. For sentencing purposes, the district court assigned Garner an offense level of 24, which reflected enhancements for having possessed from three to seven firearms, *see* U.S.S.G. § 2K2.1(b)(1)(A) (2004),[2] and for obstruction of justice, § 3C1.1. Coupled with a criminal history category of VI, that offense level called for a sentence of 100 to 125 months. The government urged the court to impose a sentence of ten years based on Garner's history of violence

---

[2] The district court calculated Garner's Guidelines sentencing range using the 2004 version of the Guidelines. Therefore, all of our citations to the Guidelines are to that version.

against women and repeated weapons offenses, among other factors. Garner's counsel urged the court to impose a sentence of just two years, arguing among other things that Garner's federal convictions were for purely status offenses, that he was responsible for raising five of his children, and that his criminal history comprised misdemeanor offenses only. The court sided with the government and ordered him to serve a prison term of 120 months.

## II.

### A.

As a result of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), the Sentencing Guidelines are no longer binding. However, a district court remains obliged to consult the Guidelines and consider imposing a sentence within the advisory Guidelines range. *E.g.*, *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006). For that purpose, the district court must of course calculate the Guidelines range accurately. *E.g.*, *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006). Garner believes that the court erred when it found that he had obstructed justice and enhanced his offense level accordingly. Specifically, Garner asserts that the court based the obstruction enhancement on grounds that were improper and that the court did not make findings adequate to support the enhancement.

Garner's first challenge is based on certain remarks that the district judge made prior to imposing the enhancement. The court referenced two things in these remarks. First, the court noted that Garner had made a variety of representations to the probation officer about his education (along with other aspects of his history and background) that the probation officer either had determined to be inaccurate or had been unable to verify. Second, and more importantly, the court referred to Garner's prior

equivocation over whether to plead guilty to state charges of battery and theft of moveable property. A transcript of a hearing in 2000 on those charges, during which the parties discussed with the presiding judge (Judge Conen) the possibility of Garner pleading no contest to the charges pursuant *North Carolina v. Alford*, 400 U.S. 25, 91 Ct. 160 (1970), revealed that Garner's reluctance to make up his mind had contributed to a two-day delay in the start of the trial while the government's witnesses were kept waiting. R. 79 Ex. 1.[3] As is evident from the court's remarks, the court saw both of these matters as relevant to an obstruction finding:

> Relative to the obstructing, this ties in with this lack of verification of all these things that were stated on the record relative to graduation from St. John's; Hawaii education; the U.W.M. education; these types of things. And there is a certain connection here, too. And the Court based on experience sees it as such. The reluctance to admit one's guilt before Judge Conen and that *Alford* plea situation. Two days to make up one's mind as to whether I did something or I didn't do something, it's no wonder that Judge Conen said I will give you a minute to make up your mind. But this in the second day of trial when you had ample opportunity to consult with Scott Wales [his attorney] and talk about this.

---

[3]  The government submitted the transcript of that hearing, along with the transcript of a sentencing hearing in another state prosecution, in response to Garner's contention that his eventual guilty pleas in those two cases had been coerced and that his convictions therefore should not be counted in the assessment of his criminal history. *See* Addendum to Pre-Sentence Report at 2-3 (discussing Garner's objections to ¶¶ 53-56 of the Pre-Sentence Report). The government viewed the transcripts as proof that Garner had in no way been coerced in either proceeding. R. 79 at 1-2.

> And there is a reluctance here on the part of you to recognize error. And as the Court said, there is this huge blank spot and failure to recognize the real deficiencies when it comes to admitting and fessing up to this real problem. And that's the case here with this not guilty plea. . . .

R. 90 at 48. Garner maintains that his statements to the probation officer regarding his education were irrelevant and so were not a proper basis for the obstruction enhancement. The fact that he equivocated over his plea in the prior state prosecution involved the exercise of his constitutional right to plead not guilty and hold the state to its burden of proof, and so Garner contends that the court could not permissibly consider his hesitation in deciding whether he had obstructed justice.

When placed in context, however, these remarks do not to our mind suggest that the court was making a finding of obstruction based on inappropriate considerations. The court's observation that Garner was reluctant to recognize his own mistakes was rendered as part of a broader assessment of Garner and his criminal history. At the outset of the sentencing hearing, the court recognized that after *Booker*, its task was to determine a sentencing range by applying the relevant provisions of the Sentencing Guidelines, consider that range as presumptively reasonable but not binding, and independently determine an appropriate sentence. R. 90 at 2-3. After entertaining counsel's respective arguments as to the relevant sentencing factors and their sentencing recommendations, and after hearing Garner's allocution, the court then turned to the sentencing factors identified in 18 U.S.C. § 3553(a). R. 90 at 39. The court proceeded to consider the gravity of Garner's offense, his history and character, the sentencing goals of rehabilitation, deterrence of criminal conduct, and just punishment, and the need to protect the community. *Id.* at 39-40. It was in the discussion of Garner's history and character that the

court raised Garner's reluctance to recognize and take responsibility for his failings. The court discerned from Garner's criminal history an unwillingness to obey rules, a tendency to lose his temper with and to batter women, and a practice of keeping guns at hand. *Id.* at 43-47. The court also noted that Garner previously had made the very same expression of remorse, pledge of reform, and assurance that he was a good father that he and his counsel were now arguing in support of a lower sentence. *Id.* at 43-44.[4] The court saw in Garner's repeated crimes and promises of change a "blind spot," a "failure of self-recognition" that, together with his evident willingness to possess firearms in violation of the law, contributed to a very real risk that Garner's pattern of misconduct might one day result in the infliction of grave harm on others. *Id.* at 44; *see also id.* at 45-47.

It was against this backdrop that the court made the remarks Garner has highlighted here. The court cited Garner's equivocation over whether to enter a guilty or *Alford* plea in a prior case as among the circumstances signaling that Garner was slow to acknowledge and take responsibility for his criminal acts. And as we understand the court's remarks, the court cited certain unconfirmed or discredited representations by Garner about his educational history as evidence of his overall lack of candor. Both observations are consistent with the court's overall concern that Garner was not inclined to accept responsibility for his criminal conduct and that his promises of reformation were not genuine.

The court said that Garner's obstruction of justice "tie[d] in" with these two observations, *id.* at 48, but we under-

---

[4] The court cited the transcript of the sentencing hearing in a prior state prosecution, during which Garner made many of the same arguments in favor of a lenient sentence that he was now making in federal court. R. 90 at 43-44; *see* R. 79 Ex. 2 at 23-25.

stand the court to have meant that they did so in terms of context, not that they constituted a basis for the court's finding of obstruction. In fact, the court went on to cite a specific ground for the obstruction finding: that Garner had attempted to suborn false statements from Sankey regarding the Hi-Point semi-automatic pistol found in his possession in January 2004. *Id.* at 48-49.

As we have noted, Garner had tried (unsuccessfully) to have Sankey tell the authorities that the Hi-Point pistol found in the van with Garner in January 2004 belonged to Sankey and that he had simply left it in the van by mistake. The testimony of both Sankey and Samuel, along with the recorded conversations Garner had with his mother and with Pittman, supplied ample proof of that effort. And it is a fair inference that what Garner wanted Sankey to say about the gun, like Garner's own trial testimony on the subject, was false: the notion that the gun belonged to Sankey was inconsistent not only with the testimony of Samuel and Sankey but also with Garner's own post-arrest statements to the authorities acknowledging that the gun was in fact his. The district court thus had a solid basis on which to conclude that Garner had attempted to obstruct justice in his unsuccessful attempt to solicit help from Sankey.

Still, Garner maintains that even if the court had a potentially appropriate ground for the obstruction enhancement, the court did not make findings adequate to support the enhancement on that basis. Garner points out that the probation officer recommended the enhancement based on Garner's own trial testimony, which the officer viewed as willfully false insofar as Garner disclaimed ownership of the Hi-Point pistol. Pre-Sentence Report ("PSR") ¶¶ 18, 32. Yet, it is not clear that the court ever made a finding of its own on this point. The sentencing transcript suggests that the court was inclined to agree with the probation officer that Garner had perjured himself on the stand. The court

said, for example, that Garner's "stories fluctuated all over the place," R. 90 at 49, and that his story-telling went beyond factual "misinterpretations," *id.* More to the point, the court observed that the right to plead not guilty "doesn't give one the right to come to court and tell something that's totally out of whack, way out of line." *Id.* at 48. Yet, the court never specified what aspect of Garner's testimony that it found to be false. By contrast, the probation officer did make such a finding in the PSR. But so far as we can discern, the court never adopted the findings set forth in the PSR, so we cannot rely on those findings as a basis for the enhancement. *See, e.g., United States v. Heath*, 447 F.3d 535, 540-41 (7th Cir. 2006).

Nonetheless, the court did reference Garner's attempt to solicit false statements from Sankey, and that alone supports the enhancement. *See, e.g., United States v. Davis*, 442 F.3d 1003, 1009 (7th Cir. 2006). Notably, both the probation officer (PSR ¶ 18) and the government (Addendum to PSR at 2; R. 90 at 4-6) had identified that attempt as a second ground for the obstruction enhancement. For its part, the court quite clearly was persuaded that Garner had attempted to convince Sankey to falsely inform investigators that the Hi-Point belonged to Sankey rather than Garner: the court stated that it had listened to the tapes of Garner's conversations and that it viewed those conversations as evidence of "an attempt to suborn Mr. Sankey, trying to get to him through Itchy, or Seymour Samuel . . . ." R. 90 at 48-49. And the court evidently had this conduct in mind when it subsequently referred to Garner's "effort to alter the fact finder's perception . . . by aggressive . . . [a]nd purposeful activity." *Id.* at 49. It is true that the court's ultimate remarks concerning the enhancement for obstruction were somewhat passive: "So if the Court was making a ruling, and I suppose it has to, it wouldn't find that that enhancement is undue." *Id.* But the court plainly understood that it was obliged to make a finding that Garner had

"attempted to obstruct or impede[ ] the administration of justice," U.S.S.G. § 3C1.1, and the record leaves no doubt that the court did so find, based on the effort to secure false statements from Sankey.

The court did not err in imposing the enhancement.

**B.**

Garner contends that the 120-month prison term imposed by the district court is unreasonable in light of circumstances which, in his view, call for a lesser sentence. He points out first that the criminal conduct underlying his convictions in this case was not inherently dangerous: beyond possessing the firearms, Garner did not (so far as the record reveals) use them for the commission of a separate crime or in a manner that harmed anyone. Second, Garner believes that the sentence is out of proportion with his character and history. Garner emphasizes that although he was assigned the highest possible criminal history category of VI under the Guidelines, his prior convictions were all misdemeanors and in most instances he did not serve any jail time. He adds that because he is a father and has been responsible for raising five of his twelve children, a lengthy period of incarceration will impose undue burdens on society as well as his children. Finally, consistent with his challenge to the obstruction enhancement, Garner again suggests that his sentence was based in part upon the district court's consideration of inappropriate factors, including the exercise of his constitutional rights.

As the district court recognized, a sentencing court must consult the Guidelines along with the general sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a reasonable sentence. *Booker*, 543 U.S. at 259-60, 125 S. Ct. at 764-65; *Laufle*, 433 F.3d at 987. A sentence within a properly calculated Guidelines range is presumptively reasonable. *United States v. Mykytiuk*, 415 F.3d 606, 608

(7th Cir. 2005). A defendant challenging such a sentence bears the burden of demonstrating that it is unreasonable. *Id.* Garner has not met that burden.

We note that the district court thoroughly complied with its sentencing obligations. The court properly calculated the Guidelines range. It recognized that it was obligated to consider a sentence within that range but was not bound to do so. And the court considered at length the sentencing factors set forth in section 3553(a). There can be no argument that the court's methodology was flawed.

Moreover, Garner has not shown that the sentence the district court imposed was unreasonable. It is true that Garner's convictions were based solely on his possession of firearms and ammunition, and there is no evidence indicating that Garner used or intended to use those weapons to commit a separate crime[5] or in a way that resulted in an injury to anyone. But that is not at all unusual with status-based offenses like this one. The statutory ban on the possession of weapons by felons recognizes the risk inherent in arming someone with a proven inclination to engage in serious criminal activity. *See Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 118-19, 103 S. Ct. 986, 995 (1983); *Lewis v. United States*, 445 U.S. 55, 66, 100 S. Ct. 915, 921 (1980). The danger is no less serious for persons with a history of domestic violence. *United States v. Lewitzke*, 176 F.3d 1022, 1026 (7th Cir. 1999). And that risk was present here, as Judge Randa pointed out: Garner had a history of repeatedly battering women, and it is not at all unreasonable to think that his possession of firearms might one day result in grave harm. That pattern of violence also reveals that Garner's criminal history is much more serious than the misdemeanor nature

---

[5] Had there been such evidence, the advisory Guidelines range likely would have been higher. *See* U.S.S.G. § 2K2.1(c).

of his prior offenses might otherwise suggest. In short, the district court reasonably concluded that a sentence within the Guidelines range was commensurate with the gravity of Garner's federal convictions as well as his criminal history. We accept that Garner's separation from his children will impose hardships on them as well as him, although we add that that is hardly an unusual circumstance. *See United States v. Brisson*, 448 F.3d 989, 993 (7th Cir. 2006). Yet, lesser punishments clearly have not succeeded in altering Garner's behavior. As Judge Randa noted, this is hardly the first occasion on which Garner has professed remorse and invoked his children in a plea for leniency. Finally, as discussed above, the district court did not punish Garner for having hesitated in entering a guilty or no-contest plea in the prior state prosecution. As we have discussed, the judge's point was that Garner's equivocation over the plea was consistent with a pattern of not accepting responsibility for his conduct, a pattern which in part convinced the judge that a sentence below the Guidelines range was not warranted.

## III.

We AFFIRM Garner's sentence.

No. 05-2513                                                                    15

A true Copy:

    Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*