In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-3294 & 05-3681

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAUL ROMERO and RICARDO ROMERO,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 04 CR 164—**Barbara B. Crabb**, *Chief Judge.*

ARGUED SEPTEMBER 15, 2006—DECIDED DECEMBER 8, 2006

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* On October 6, 2004, a grand jury in the Western District of Wisconsin returned an 18-count superseding indictment charging narcotics violations against seven individuals including Raul and Ricardo Romero. The indictment resulted from a two-year joint federal, state and local law enforcement investigation into drug trafficking by the "Romero organization" in Madison, Wisconsin. Several individuals in the Romero organization are brothers including Raul and Ricardo Romero. The government alleged that Raul Romero was a drug dealer in the organization while Ricardo Romero was a drug courier.

Raul Romero pled guilty to one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and was sentenced to 130 months' imprisonment. Ricardo Romero was found guilty by a jury of one count of conspiring to distribute cocaine in violation of 21 U.S.C. § 846, one count of possession of five grams or more of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Ricardo Romero to a term of 151 months' imprisonment. Ricardo Romero appeals his conviction and both Ricardo and Raul Romero appeal their respective sentences. We affirm both the conviction and sentences.

## I.  BACKGROUND

### A.  Raul Romero

At his plea colloquy, Raul Romero admitted to selling cocaine to an undercover police officer on April 7, 2004. The undercover officer had set up a controlled drug buy as part of the then ongoing law enforcement investigation of the Romero organization. Raul Romero sent Joshua Carrasquillo, another member of the Romero organization, to deliver 27.9 grams of cocaine to the undercover officer in exchange for $850. The transaction occurred in the parking lot of the Kennedy Heights apartment complex in Madison. Carrasquillo also discussed the possibility of future drug transactions with the undercover police officer on behalf of Raul Romero.

In the Presentence Investigation Report ("PSR"), the Probation Officer determined that Raul Romero was responsible for selling drugs from at least November 2003 through April 2004. The Probation Officer calculated Raul Romero's relevant conduct at 2.5 kilograms of cocaine

and, applying the November 2004 Sentencing Guidelines, his base offense level was 28. *See* U.S.S.G. § 2D1.1(c)(6).

Raul Romero objected to the PSR arguing that he was responsible for less than two kilograms of cocaine. The government countered that the 2.5 kilogram amount was a conservative estimate and the reality was that Raul Romero was responsible for significantly more drugs than the 2.5 kilograms of cocaine set forth in the PSR. The government, however, chose not to pursue an amount above and beyond the 2.5 kilograms at sentencing. The government did argue that Raul Romero should not receive a reduction for acceptance of responsibility if he contested the 2.5 kilograms.

Raul Romero continued in his objection to the PSR and the district court conducted a sentencing hearing on July 20, 2005. The government presented in-court testimony from a Drug Enforcement Administration ("DEA") agent who participated in the Romero investigation. The DEA agent testified as to the government's investigation of Raul Romero including undercover drug purchases as well as physical and electronic surveillance. The government also provided in-court testimony from cooperating witness Jose David Suarez and the prior grand jury testimony of cooperating witnesses Jacourtney Ticey and Danny Turner. Suarez, Ticey, and Turner testified as to their participation in, and witnessing of, drug transactions and other drug related activities involving Raul Romero.

The district court determined that the government had met its burden and found Raul Romero responsible for 2.5 kilograms of cocaine. The court also held that Raul Romero was not eligible to receive a reduction for acceptance of responsibility. In explaining her decision, the district court commented:

> I mean it's very clear to me that, Mr. [Raul] Romero, you were involved in a lot more than the quantity that the government said it could prove against you and the quantity that was listed in the Presentence [Investigation] Report. And in contesting that, you were really denying responsibility for your involvement in the amount of cocaine for which you're responsible, and I'm not going to give you an adjustment for acceptance of responsibility. You knew the risk. You went ahead and took it. Well, this is what the consequence is.

Tr. at 99-100, July 20, 2005. The district court then calculated Raul Romero's advisory Sentencing Guideline range. Raul Romero's base offense level was 28 for the 2.5 kilograms of cocaine and this was enhanced by two levels for obstruction of justice[1] for a total offense level of 30. With his criminal history category of III, Raul Romero's resulting advisory Sentencing Guidelines range was 121 to 151 months' imprisonment. The district court, after considering the sentencing factors set forth in 18 U.S.C. § 3553(a), imposed a sentence of 130 months' imprisonment.

## B. Ricardo Romero

Ricardo Romero's conviction is based on his April 30, 2004 delivery of a blue cookie tin that contained cocaine and cocaine base. The government's theory of the case was that Ricardo Romero transported the drugs to his mother's apartment on Troy Drive in order to facilitate a drug sale between Raul Romero and Danny Turner. As

---

[1] The two level enhancement for obstruction of justice was assessed against both Raul and Ricardo Romero for their participation in an assault on a potential government witness. Neither challenged the obstruction of justice enhancement in their appeal so we shall not discuss it further.

Ricardo Romero's present appeal attacks the validity of both his conviction and sentence, we recount the evidence presented at trial and sentencing.

On the morning of April 30, 2004, Mary Jane Almeida, Ricardo Romero's girlfriend at the time, left her home and went to her volunteer job at a local elementary school. Almeida was seventeen and a high school senior. Almeida and Ricardo Romero had known each other for approximately one and one-half months prior to April 30, 2004. Ricardo Romero, who had spent the prior evening at Almeida's home, remained at Almeida's home while she was at her job. Almeida drove Ricardo Romero's blue Oldsmobile Aurora to the volunteer job. She returned to her home at approximately 11:30 a.m. Almeida and Ricardo Romero had no prior joint plans to leave her home after she had returned from her volunteer job. In fact, Almeida had her own possible plans of going back to her volunteer job later in the day without Ricardo Romero.

Ricardo Romero then received a telephone call. Almeida testified, based on her viewing of the caller ID, that the telephone call had come from Ricardo Romero's mother's apartment on Troy Drive. The call lasted a few minutes and promptly thereafter Ricardo Romero and Almeida left for the mother's apartment. Almeida testified that Ricardo Romero was holding the blue cookie tin when they left for the Troy Drive apartment. She drove Ricardo Romero's Oldsmobile Aurora accompanying him to the apartment.

Ricardo Romero and Almeida arrived outside the Troy Drive apartment at approximately 11:45 a.m. According to Almeida, upon arriving, but before exiting the Oldsmobile, Almeida gave the car keys back to Ricardo Romero. However, he immediately returned the car keys to her along with the cookie tin and some clothing asking Almeida to hold onto these items for him. Almeida put the

cookie tin, keys and clothing into her large size purse and then she and Ricardo Romero walked into the apartment building. Upon entering the apartment building, Ricardo Romero "grabbed" the cookie tin from Almeida's purse and then they continued to the apartment. Tr. at 114-15, June 20, 2005.

Several people were in the mother's apartment when Almeida and Ricardo Romero arrived including Raul Romero, Ricardo Romero's mother, Ricardo Romero's nephews, and Turner. Turner testified that he had gone with Raul Romero to the Troy Drive apartment with the intent of receiving cocaine from Raul Romero. Turner had already paid Raul Romero for one-eighth of an ounce of cocaine. Raul Romero informed Turner that he did not have any cocaine when he arrived at the apartment and they needed to wait for cocaine to be delivered. Turner and Raul Romero waited for approximately five to ten minutes and then Ricardo Romero and Almeida arrived. Upon arriving, Ricardo Romero gave the cookie tin to Raul Romero and then Raul Romero went to the bathroom with the cookie tin. Raul Romero then gave cocaine to Turner and Turner left the apartment. The cookie tin was returned to Ricardo Romero who gave the cookie tin back to Almeida. Almeida placed the cookie tin back in her purse and she and Ricardo Romero left the apartment. Almeida was sitting on the living room couch reading a magazine during her time in the apartment.

Law enforcement involved in the Romero organization investigation were performing surveillance of the Troy Drive apartment on April 30, 2004. Officers witnessed Turner leave the apartment building. They also witnessed Ricardo Romero and Almeida enter and exit the apartment building. Law enforcement followed Ricardo Romero and Almeida as Almeida drove Ricardo Romero's car away from the mother's apartment. The police officers then executed a valid traffic stop and valid search of the

Oldsmobile. Almeida's purse was on the backseat of the Oldsmobile. The police discovered the cookie tin containing the cocaine and cocaine base. Ricardo Romero and Almeida were then arrested. During its subsequent investigation, the government concluded that Almeida was neither aware of the drugs in the cookie tin nor involved in any drug transactions and therefore she was not charged in this case.

At trial, the government provided testimony from cooperating witness Suarez to prove that Ricardo Romero was actively involved in drug transactions in the Romero organization and thus aware that he was delivering drugs to Raul Romero on April 30, 2004. Suarez was a drug dealer who purchased drugs from various members of the Romero organization including Raul Romero. Suarez testified that he witnessed Ricardo Romero deliver cocaine to Raul Romero in the parking lot of an apartment building on Badger Road in Madison sometime in late Fall 2003. Suarez also testified that he saw Raul Romero give money to Ricardo Romero on several occasions.

Ricardo Romero countered that he had no knowledge that there were drugs in the cookie tin. His strategy at trial was to attack the credibility of the government's witnesses on cross-examination. With Almeida, he focused on inconsistencies in her story and the fact that her recollection of events had changed during her various interviews with the police. He also attempted to impeach Almeida with her prior statement from a state court proceeding. The district court sustained the government's objection to this line of questioning concluding that the state case was an unrelated collateral matter that would unduly confuse the jury. Ricardo Romero also suggested at closing argument that Almeida was the actual drug courier for Raul Romero.

With Turner and Suarez, Ricardo Romero attacked their credibility by pointing out they reached agreements with

the government that would lower their sentences in exchange for their cooperation. Ricardo Romero also attacked Suarez's testimony by noting that he had initially failed to make any mention of Ricardo Romero in his prior statements to law enforcement. Ricardo Romero argued that Suarez had provided the story about witnessing the drug delivery in Fall 2003 after law enforcement had pressed him looking for information on the eve of Ricardo Romero's trial.

Ricardo Romero also introduced evidence that he was incarcerated in the local county jail until December 16, 2003. On cross-examination, Ricardo Romero had been able to pin down Suarez to a November 2003 date for the Badger Road drug delivery that Suarez claimed to have witnessed between Raul and Ricardo Romero. Ricardo Romero argued to the jury that Suarez's testimony was impossible because he was in jail in November 2003 and therefore could not have participated in any drug transactions at the Badger Road apartment building parking lot. Without Suarez's testimony, Ricardo Romero postulated there was no evidence demonstrating that he knew what was in the cookie tin, had any intent to distribute drugs or knew about Raul Romero's drug dealing activities.

The government also introduced evidence to establish that the cookie tin contained both powder cocaine and cocaine base. The officers who arrested Ricardo Romero testified that they reached their conclusions about the drugs they observed in the cookie tin based on their training and experience. A chemist from the Wisconsin Department of Justice Crime Laboratory also testified as to the testing that he performed on the seized drugs. The chemist stated that it was his opinion that the seized drugs were both powder cocaine and cocaine base commonly referred to as crack cocaine.

After the jury verdicts, Ricardo Romero filed a motion for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. He argued there was no evidence proving his knowledge as to the existence of drugs in the cookie tin. The district court disagreed holding that there was sufficient evidence for the jury to have inferred that he knew that he was transporting drugs in the cookie tin. The district court also noted that the jury could have credited Suarez with being confused about the date that he witnessed the drug delivery between Ricardo and Raul Romero as Suarez was uncertain about the date that it had occurred. In rejecting Ricardo Romero's motion, the district court commented, "In light of the evidence, what rational jury would believe that [Ricardo Romero] thought that the tin contained chocolate chip cookies?" R. 237 at 3.

At sentencing, the district court determined that the cocaine base in the cookie tin was crack cocaine. Applying the November 2004 Guidelines, the district court calculated Ricardo Romero's base offense level at 26. U.S.S.G. § 2D1.1. The offense level was enhanced two levels for use of a minor, U.S.S.G. § 3B1.4, and an additional two level enhancement for obstruction of justice, U.S.S.G. § 3C1.1, for a total offense level of 30. Ricardo Romero had a criminal history of V and his corresponding Sentencing Guidelines Range was 151-188 months. The district court, after considering the factors set forth in 18 U.S.C. § 3553(a), imposed a sentence of 151 months' imprisonment.

## II. ANALYSIS

### A. Raul Romero

On appeal, Raul Romero argues that the district court erred when it found that he was responsible for 2.5

kilograms of cocaine and ineligible for a three level reduction for acceptance of responsibility. Specifically, he argues that the district court erred by including in the 2.5 kilogram cocaine amount: (1) 1000 grams of cocaine located in Anthony Romero's Kennedy Heights apartment, and (2) 850.5 grams of cocaine attributed to him from Turner's testimony. Raul Romero concludes that he is responsible for at least 500 grams but less than 2 kilograms of cocaine. He argues that his total offense level should only be 25, and with his criminal history category of III, his proposed advisory Sentencing Guidelines range is 70-87 months instead of the 121-151 months range calculated by the district court.

### 1. Relevant Conduct

Although *Booker* has transformed the Guidelines from binding to advisory, the "district court remains oblig[ated] to consult the Guidelines." *United States v. Garner*, 454 F.3d 743, 747 (7th Cir. 2006) (citing *United States v. Booker*, 543 U.S. 220 (2005); *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006)). This obligation requires the district court to have "a correct understanding of [the Guidelines'] application to the defendant's conduct." *United States v. Avila*, 465 F.3d 796 (7th Cir. 2006). Consequently at sentencing, the "district [court] must resolve [factual disputes], determine relevant conduct by a preponderance of the evidence, and apply the appropriate sentenc[ing] enhancements in order to compute the advisory [G]uidelines Sentenc[ing] range." *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006) (citing FED. R. CRIM. P. 32 (i)(3)(B); U.S.S.G. § 6A1.3(b); *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005)).

"The [district] court's sentenc[ing] determinations [as to factual disputes] must be based on reliable evidence, not speculation or unfounded allegations." *United States v.*

*Noble*, 246 F.3d 946, 951 (7th Cir. 2001) (citing *United States v. Pigee*, 197 F.3d 879, 889 (7th Cir. 1999); *United States v. Howard*, 80 F.3d 1194, 1204 (7th Cir. 1996)). The defendant's "due process right to be sentenced on the basis of accurate information . . . is generally satisfied when the facts in question are found by a preponderance of the evidence using information that has a sufficient indicia of reliability to support its probable accuracy." *United States v. Lister*, 432 F.3d 754, 762 (7th Cir. 2005) (quoting *United States v. Townsend,* 73 F.3d 747, 751-52 (7th Cir. 1996); *United States v. Salinas*, 62 F.3d 855, 859 (7th Cir. 1995); *United States v. Ewers*, 54 F.3d 419, 421 (7th Cir. 1995) (internal quotations and citations omitted)).

"The [G]uidelines instruct district courts to calculate sentences based on types and quantities of drugs not specified in the counts of conviction but that were 'part of the same course of conduct or common scheme or plan' as the convicted offenses." *United States v. Arroyo*, 406 F.3d 881, 888-89 (7th Cir. 2005) (quoting U.S.S.G. § 1B1.3(a)(2); *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998)). "Two or more offenses are part of a common scheme or plan when they are substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *United States v. Sumner*, 265 F.3d 532, 540 (7th Cir. 2001) (quoting U.S.S.G. § 1B1.3(a)(2), app. n.9; *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996)). In determining relevant conduct, "the district court is entitled to estimate drug quantity using testimony about the frequency of dealing and the amount dealt over a specified period of time." *Noble*, 246 F.3d at 952 (citing *United States v. Durham*, 211 F.3d 437, 444 (7th Cir. 2000)). The district court is also entitled to credit testimony that it finds reliable even when that testimony is provided by an "admitted liar, convicted felon, or large scale drug-dealing, paid government infor-

mant." *United States v. Blalock*, 321 F.3d 686, 690 (7th Cir. 2003) (quoting *United States v. Partee*, 301 F.3d 576, 579 (7th Cir. 2002)).

"Generally, a court is entitled to rely on the PSR in ruling on factual issues in the sentencing context so long as the PSR is based upon sufficiently reliable information." *United States v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002) (citing *United States v. Taylor*, 72 F.3d 533, 547 (7th Cir. 1995)). "When the [district] court relies on such information in sentencing a defendant, the defendant bears the burden of showing that the [PSR] is inaccurate or unreliable." *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004) (citing *Taylor*, 72 F.3d at 547; *United States v. Mustread*, 42 F.3d 1097, 1101-02 (7th Cir. 1994)). The "defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, he must produce some evidence that calls the reliability or correctness of the alleged facts into question." *United States v. Jones*, 209 F.3d 991, 996 (7th Cir. 2000) (quoting *Mustread*, 42 F.3d at 1102; *United States v. Isirov*, 986 F.2d 183, 186 (7th Cir. 1993) (internal quotations omitted)).

"We review the district court's application of the Guidelines *de novo* and its factual determinations for clear error." *United States v. Warren*, 454 F.3d 752, 762 (7th Cir. 2006) (citing *United States v. Davis*, 442 F.3d 1003, 1008-09 (7th Cir. 2006)). "A district court's finding as to drug quantity for sentencing purposes is reviewed for clear error." *United States v. Smith*, 308 F.3d 726, 745 (7th Cir. 2002) (citing *United States v. Westmoreland*, 240 F.3d 618, 629-30 (7th Cir. 2001); *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998)). We will not overturn the district court's factual findings unless we are "left with the definite and firm conviction that a mistake" was made by the district court. *United States v. Bennett*, 461 F.3d 910, 912 (7th Cir. 2006) (citing *United States v.*

*Corral*, 324 F.3d 866, 870 (7th Cir. 2003)). "We are reluctant to disturb [a district court's] credibility determinations absent a compelling reason." *United States v. Noble*, 246 F.3d 946, 951 (7th Cir. 2001).

The disputed 1000 grams of cocaine relates to a January 16, 2004 drug sale between Raul Romero and cooperating witness Ticey. Raul Romero and Ticey arranged the sale, but Raul Romero directed Ticey to pick up the drugs at Anthony Romero's Kennedy Heights apartment. Ticey was met by Suarez who provided the drugs to Ticey from a drug stash located inside Anthony Romero's Kennedy Heights apartment. While in Anthony Romero's apartment, Ticey also witnessed 1000 grams of cocaine packaged in 40 one-ounce bags. Ticey then called Raul Romero to confirm that he had received the drugs and arranged for payment. The district court determined that Raul Romero was selling drugs out of a stash located in Anthony Romero's Kennedy Heights apartment and therefore Raul Romero was responsible for the 1000 grams of cocaine witnessed by Ticey in Anthony Romero's apartment.

Raul Romero counters that he was merely referring Ticey to Anthony Romero and that there was no connection between himself and Anthony Romero. He points to application note 6 to Guidelines § 1B1.3(a)(2) that discusses the factual situation of two street level drug dealers who have a common source of drugs but otherwise have no connection. The comment states that the two street level drug dealers are not responsible for the conduct of the other dealer, despite having the same supplier.

We find no reason to disturb the district court's finding that Raul Romero is responsible for the 1000 grams of cocaine in Anthony Romero's Kennedy Height's apartment. The drug sale to Ticey and the offense conduct of the sale to the undercover officer share the common factors of similar *modus operandi* and common purpose. *See United*

*States v. Sumner*, 265 F.3d 532, 540 (7th Cir. 2001) (citing U.S.S.G. § 1B1.3(a)(2), app. n.9; *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996)). In both situations, Raul Romero made a drug sale and then sent the customer to pick up the drugs from the Kennedy Heights apartment. The drugs were delivered to the customer by a third party who had received instructions from Raul Romero. In both situations, the customer discussed potential future transactions with Raul Romero's representative who, at the time, was acting on behalf of Raul Romero. Both transactions also had the common purpose of distributing drugs on behalf of the Romero organization.

We are also unconvinced by Raul Romero's argument that he and Anthony Romero were merely two "street level" dealers who were sharing a common stash of drugs but otherwise were not working together. The district court heard testimony at the sentencing hearing from the DEA agent as to the significant number of wiretaps, undercover buys and other observations made by the government during its investigation of the Romero organization. This evidence demonstrated the extent of the Romero organization's drug dealing activities and Raul's participation in those activities. This evidence is also extensively set forth in the PSR and Raul Romero has done nothing to rebut this evidence.

Raul Romero also disputes 850.5 grams included in his offense level calculation. This amount comes from Turner's testimony. Turner testified before a grand jury that he purchased on average three ounces of cocaine from Raul Romero per week over a five month basis. He also testified at Ricardo Romero's trial that he purchased cocaine from Raul Romero on April 30, 2004. However, after his grand jury testimony, but before testifying at Ricardo Romero's trial, Turner wrote a note to Raul Romero's counsel stating that he had lied to investigators and that Raul Romero had never sold him drugs. At sentencing, the district court

credited Turner's sworn testimony over Turner's unsworn note and found Raul Romero responsible for the 850.5 grams. The district court also found that Turner's testimony of Raul Romero's drug dealing activities were corroborated by the testimony of the DEA agent. We see no reason to overturn the district court's decision on crediting Turner's sworn testimony because "we are reluctant to disturb a [district court's] credibility determinations absent a compelling reason." *United States v. Noble*, 246 F.3d 946, 951 (7th Cir. 2001). Raul Romero provides us no compelling reason to disregard the district court's decision on this issue.

### 2.  Acceptance of Responsibility

The district court properly denied Raul Romero a reduction for acceptance of responsibility pursuant to Guidelines § 3E1.1 because Raul Romero frivolously contested his relevant conduct at the sentencing hearing. Although a defendant's entry of a guilty plea may demonstrate that he has accepted responsibility for his criminal acts, a guilty plea does not qualify the defendant for an acceptance of responsibility reduction as a matter of right. *United States v. Leahy*, 464 F.3d 773, 791 (7th Cir. 2006) (citing *United States v. Bothum*, 424 F.3d 582, 586 (7th Cir. 2005); *United States v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002)). "A defendant who 'falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.'" *United States v. Sharp*, 436 F.3d 730, 735 (7th Cir. 2006) (citing U.S.S.G. § 3E1.1 cmt. n.1(a)).

Not only was there significant evidence to support the 2.5 kilograms of cocaine, but as the government properly noted at sentencing, the relevant conduct set forth in the PSR under-reported the extent of Raul Romero's

criminal activities. We are unsure as to why the government acquiesced to the under-reporting of Raul Romero's relevant conduct in the PSR, but we will move beyond that question as the government did not object at sentencing and has not cross-appealed. Regardless, there was more than sufficient evidence to substantiate the 2.5 kilograms of cocaine based on the information set forth in the PSR and considered by the district court at the sentencing hearing. The district court's conclusion that Raul Romero raised a frivolous argument on the relevant conduct issue was not a clear error and therefore we see no reason to disturb the district court's decision.

In closing, we note that Raul Romero does not otherwise challenge his Guidelines calculation. The district court understood the advisory nature of the Guidelines, properly calculated the Guidelines range and considered the sentencing factors set forth in 18 U.S.C. § 3553(a). Raul Romero's sentence of 130 months' imprisonment is within the Guidelines range of 121 to 151 months' imprisonment and is therefore entitled to a rebuttable presumption of reasonableness. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). We see no reason to find Raul Romero's sentence unreasonable and therefore it shall be affirmed.

## B. Ricardo Romero

### 1. Sixth Amendment Cross-Examination Claim

On appeal, Ricardo Romero argues that the district court erred by refusing his attempt to cross-examine Almeida on her prior inconsistent statement from the state court proceeding. "The Sixth Amendment right of confrontation requires that a defendant be given an opportunity for effective cross-examination." *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006) (citing *Pennsyl-*

*vania v. Ritchie*, 480 U.S. 39, 51 (1987); *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)). "The right to cross-examine is not unlimited; the Confrontation Clause guarantees only effective cross-examination, not cross-examination of any type sought by the defendant." *United States v. Williamson*, 202 F.3d 974, 977 (7th Cir. 2000) (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). "[T]rial courts have wide latitude 'to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. McGee*, 408 F.3d 966, 975 (7th Cir. 2005) (quoting *Van Arsdall*, 475 U.S. at 679).

Our standard of review is determined through our evaluation of whether the alleged error implicates "core values of the [Sixth Amendment] confrontation right" or instead merely implicates "peripheral concerns." *United States v. Degraffenried*, 339 F.3d 576, 581 (7th Cir. 2003) (citing *United States v. Saunders*, 973 F.2d 1354, 1358 (7th Cir. 1992)). An alleged error implicates a core value when the defendant was unable to cross-examine a witness at all on an issue protected by the Sixth Amendment while a peripheral concern involves the extent of the defendant's ability to cross-examine on an issue. *See, e.g.*, *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) ("[O]nce this core function is satisfied by allowing cross-examination to expose a motive to lie, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury."). "When reviewing the adequacy of a cross-examination, the question is whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias." *United States v. McLee*, 436 F.3d 751, 762 (7th Cir. 2006) (quoting *Nelson*, 39 F.3d at 708; *United States v. Robinson*, 832 F.2d 366, 373 (7th

Cir. 1987); *United States v. DeGudino*, 722 F.2d 1351, 1354
(7th Cir. 1983)). We review claimed errors implicating the
core value of the Sixth Amendment *de novo* while we
review peripheral concerns for abuse of discretion. *Smith*,
454 F.3d at 714 (citing *Nelson*, 39 F.3d at 708).

Ricardo Romero's theory both at trial and on appeal is
that Almeida is a "'Yes [Wo]man' for the prosecution," a
person who is willing to testify in a manner to satisfy
the government, even if that requires her to lie. Ricardo
Romero Br. at 30. Ricardo Romero attempted to demon-
strate Almeida's alleged bias through extensive cross-
examination of her at trial. He brought out the fact that
she had a scholarship to the University of Wisconsin-
Madison at the time of her arrest on April 30, 2004, and
that she was worried about the potential impact of her
arrest on her future college plans when she was inter-
viewed by the police. Cross-examination also brought out
that her relationship with Ricardo Romero ended after
the arrest. He was able to examine her regarding her
concerns about being prosecuted after the arrest but that
she was not prosecuted after she agreed to cooperate with
the government. Ricardo Romero also cross-examined
Almeida about prior inconsistent statements that she
had made to the police during the various interviews
conducted after the April 30, 2004 arrest. He was able to
draw out inconsistencies in her statements to the police
about when Almeida saw him in possession of the cookie
tin. This allowed Ricardo Romero to imply that Almeida
had changed her story in favor of the government once
she began cooperating with the government.

However, the district court prevented Ricardo Romero
from cross-examining Almeida on an alleged inconsistent
statement that she made while testifying in a state
court proceeding. The state court proceeding involved a
battery charge against Ricardo Romero. The police ques-
tioned Almeida about both the battery and the cookie tin
during her interviews. Ricardo Romero argues that he

should have been allowed to cross-examine Almeida on the inconsistent statement between Almeida's trial testimony in the battery case and her original statements to the police on the battery issue. The government objected to this line of impeachment and the district court agreed with the government holding that the battery case was too attenuated from the present drug case to be discussed and would also unduly confuse the jury.

We conclude that the district court's exclusion of cross-examination on the Almeida's prior statement in the state court battery case implicated a peripheral concern and therefore we review the district court's decision under the abuse of discretion standard. In reviewing the record on this issue, we hold that the district court did not abuse its discretion by preventing cross-examination on Almeida's inconsistent statements in the state battery case. Ricardo Romero was given ample opportunity to cross-examine Almeida on her potential biases and reasons for potentially not telling the truth while testifying at trial. He was also able to show prior inconsistent statements between her police interviews and her in-court testimony at trial. The district court allowed Ricardo Romero a substantial opportunity to pursue his theory of "Almeida as the 'Yes Woman'" for the prosecution through several areas of impeachment. The district court acted within the scope of her discretion by prohibiting cross-examination on the battery case as that cross-examination was only marginally relevant and would have confused the issues before the jury. *United States v. McGee*, 408 F.3d 966, 975 (7th Cir. 2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

## 2. Sufficiency of the Evidence

Ricardo Romero argues that the district court erred when she denied his motion for judgment of acquittal

based on the sufficiency of the evidence supporting the conviction. He argues that there was no evidence establishing that he had any knowledge that there were drugs in the cookie tin. "We review the district court's denial of a motion for judgment of acquittal de novo." *United States v. James*, 464 F.3d 699, 705 (7th Cir. 2006) (citing *United States v. Jones*, 371 F.3d 363, 365 (7th Cir. 2004); *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002)). "A party challenging the sufficiency of the evidence supporting a jury conviction faces a steep uphill battle." *United States v. Moore*, 425 F.3d 1061, 1072 (7th Cir. 2005) (quoting *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003)). "We must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Haddad*, 462 F.3d 783, 791 (7th Cir. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

There is sufficient evidence in the record to support the jury's finding that Ricardo Romero knew that there were drugs in the cookie tin and therefore we must uphold his conviction. Most notable is Ricardo Romero's change in deciding who should hold the cookie tin upon arriving outside the Troy Drive apartment. Before arriving outside the apartment, he personally held the cookie tin. However, once they arrived, he gave the tin to Almeida to hold for the walk into the apartment building but then immediately "grabbed" the cookie tin from her purse once in the apartment building. Tr. at 114-15, June 20, 2005. Almeida was also given the cookie tin to hold upon leaving the apartment. The jury could have also considered Suarez's testimony that Ricardo Romero had previously acted as a drug courier for Raul Romero in determining that Ricardo Romero was knowingly acting as a drug courier for Raul Romero on April 30, 2004.

Much of Ricardo Romero's argument as to Almeida's testimony is nothing more than an attempt to reargue the evidence. However, "[v]iewing the evidence in the light most favorable to the prosecution means that on review we will not—despite defendants' frequent requests to do so—'weigh the evidence or second guess the jury's credibility determinations.'" *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006) (quoting *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001)). The jury rejected Ricardo Romero's impeachment efforts of Almeida on the issue of his knowledge and found her version of the events credible.

We must also note that Ricardo Romero's argument misstates Almeida's role in this case. He argues that the evidence in the case demonstrated that she had no knowledge that there were drugs in the cookie tin. He then argues that the he was in the same position as Almeida and therefore concludes that if the evidence demonstrated that she lacked knowledge then he too lacked knowledge of drugs in the cookie tin. This argument is incorrect because only Ricardo Romero's knowledge was at issue at trial, Almeida's knowledge was not an issue before the jury. The fact that the prosecution decided not to charge Almeida is irrelevant on the issue of her knowledge as the prosecutor, acting in concert with the grand jury, has significant discretion in deciding whether or not to bring a charge. *See United States v. O'Neill*, 437 F.3d 654, 660 (7th Cir. 2006) (Posner, J., concurring) (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985); *United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir. 1992) ("The exercise of prosecutorial discretion is a prerogative of the executive branch of government.")).

Ricardo Romero's final argument is that Suarez's testimony about the Fall 2003 drug delivery to the Badger Road apartment building parking lot must be rejected as incredible as a matter of law. Ricardo Romero was able to

introduce evidence that he was incarcerated at the local
county jail until December 16, 2003 and therefore
could not have participated in the alleged drug delivery.
"We will not upset the jury's credibility determinations
unless 'exceptional circumstances' exist; that is, it was
'physically impossible for the witness to observe that
which he claims occurred, or impossible under the laws of
nature for the occurrence to have taken place at all.'"
*United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006)
(quoting *United States v. Smith*, 393 F.3d 717, 719 (7th
Cir. 2004)). Suarez testified on direct examination that he
witnessed the drug delivery between Ricardo and Raul
Romero on Badger Road sometime in the winter time. He
also said that he did not know an exact date. On cross
examination, Ricardo Romero tried to pin Suarez down on
a date. Suarez was unable at first to give an exact date
saying that the delivery occurred in the winter time and
that it was cold outside. He also said that he could not
remember if it was before or after Thanksgiving as he
did not pay attention to that holiday. However, Ricardo
Romero was eventually able to get Suarez to say Novem-
ber for the date.

A rational jury could have credited Suarez as being
unsure about the exact date of the Badger Road drug
delivery. The jury could have also believed that Suarez
confused the date that he witnessed the drug delivery as
his original answer focused on the fact that it was winter
time and cold outside. Furthermore, even if Suarez's
testimony is rejected, we find that there was still suf-
ficient evidence for a rational jury to have found that
Ricardo Romero had knowledge that there were drugs in
the cookie tin on April 30, 2004.

### 3. Sentencing

Ricardo Romero argues that the district court com-
mitted clear error when she found at sentencing that the

cocaine base seized in the cookie tin was crack cocaine. We have previously held that the enhanced penalties for cocaine base apply to the specific subset of cocaine base know as "crack cocaine." *See United States v. Edwards*, 397 F.3d 570, 571-72 (7th Cir. 2005). " 'Crack' [cocaine] is the street name for another form of freebase cocaine, produced by mixing cocaine hydrochloride with baking soda and water, boiling the mixture until only a solid substance is left, and allowing it to dry, resulting in a rocklike substance." *Id.* at 574. However, "we have repeatedly held that the government can prove a substance is crack [cocaine] by offering testimony from people familiar with the drug." *United States v. Anderson*, 450 F.3d 294, 301 (7th Cir. 2006). Individuals familiar with crack cocaine and therefore able to identify it include veteran narcotics agents and forensic chemists. *United States v. Linton*, 235 F.3d 328, 329-30 (7th Cir. 2000) (citing *United States v. Abdul*, 122 F.3d 477 (7th Cir. 1997)). The district court properly credited the testimony of the narcotics officers and government chemist that the cocaine base seized from Ricardo Romero was crack cocaine and we see no reason to find that this was a clear error.

Finally, Ricardo Romero argues that his sentence should be overturned because the imposition of the 100:1 crack cocaine to powder cocaine ratio unreasonably creates an unwarranted sentencing disparity. However, "a district judge is required to abide by the [100:1] crack cocaine to cocaine powder ratio when applying the Sentencing Guidelines to a defendant's conduct." *United States v. Hankton*, 463 F.3d 626, 629 (7th Cir. 2006) (quoting *United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006)).

Ricardo Romero provides no valid argument for us to find that his sentence was unreasonable. The district court understood the advisory nature of the Guidelines, properly calculated the Guidelines range and considered the sentencing factors set forth in 18 U.S.C. § 3553(a).

Ricardo Romero's sentence of 151 months' imprisonment is within the Guidelines range of 151 to 188 months' imprisonment and is therefore entitled to a rebuttable presumption of reasonableness. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). We see no reason to find Ricardo Romero's sentence unreasonable and therefore it shall be affirmed.

### III.  CONCLUSION

Raul Romero's sentence and Ricardo Romero's conviction and sentence are AFFIRMED.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—12-8-06